Edward L. LOWE, et al.,
Plaintiffs-Appellees,

v.

INGALLS SHIPBUILDING, A DIVISION OF LITTON SYSTEMS, INC.,
Defendant-Appellant.

No. 82–4361.

United States Court of Appeals,
Fifth Circuit.

Jan. 30, 1984.

Wiesenburg & Reed, Karl Wiesenburg, John H. Carlson, Pascagoula, Miss., for defendant-appellant.

Jones, Maples & Lomax, Ransom P. Jones, III, Pascagoula, Miss., for Lowe, et al.

James Hilton Crosby, Vincent A. Noletto, Jr., Mobile, Ala., for Owens-Corning Fiberglass, et al.

Before GARZA, RANDALL and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

In this declaratory judgment action we are asked to determine whether a shipyard employer, self-insured under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901, *et seq.* ("LHWCA" or the "Act"), which has paid LHWCA compensation to employees contracting asbestosis during their employment, has an "independent" cause of action, of the character recognized in *Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969), against a manufacturer of asbestos containing products used in the shipyard, for the excess of the compensation so paid over the amount for which the employees settle their third-party claims against the manufacturer. Because we conclude that neither the complaint alone, nor the record as a whole, is sufficient to establish the district court's subject matter jurisdiction, we must decline the invitation. We accordingly vacate the judgment below.

## PROCEEDINGS BELOW

This declaratory judgment action was brought by twenty-five individuals, residents of Mississippi, Alabama and Oklahoma, each either a current or former employee of Ingalls Shipbuilding Company, an unincorporated division of Litton Systems, Inc. ("Litton"), apparently at its Pascagoula, Mississippi shipyard, against Litton and Owens-Corning Fiberglass Corporation ("Owens-Corning"), each a Delaware corporation. The allegations of the complaint and the stipulations of the parties filed below reflect that prior to the institution of this suit Litton, a self-insurer under the Act, had admitted liability and paid compensation under the Act to twenty-two of the plaintiffs. Additionally, each of the plaintiffs had a separate suit against Owens-Corning, and numerous other third-party manufacturers of asbestos containing insulation products, pending in the same federal district court. In those suits plaintiffs sought to recover for their respective personal injuries from Mississippi work-related exposure to asbestos on theories of negligence, implied warranty and strict liability in tort. The plaintiffs instituted their personal injury suits before any LHWCA claims against or payments by Litton were made, and Litton was not, and did not seek

to become, a party to any of those suits. So far as the record reflects, the sole basis for federal court jurisdiction in the personal injury suits is diversity of citizenship, and none of those suits has gone to judgment or been finally settled.

The present plaintiffs, however, did reach *conditional* settlements with Owens-Corning of their personal injury suits against it. The settlement amounts were in many instances less than the amounts Litton had already paid the particular plaintiffs in LHWCA benefits respecting their asbestosis. To ensure that Owens-Corning would not be exposed to liability respecting plaintiffs' asbestosis beyond the amounts offered in settlement, consummation of the settlements was conditioned on either their being approved by Litton or judgment being procured declaring that on consummation of the settlements Owens-Corning would have no exposure to Litton, in regard to plaintiffs' asbestosis, beyond Litton's LHWCA subrogation rights respecting the settlement payments. As the complaint alleges, Litton declined to give its approval and took the position "that it has an independent right of indemnification against said Defendant, Owens-Corning Fiberglass, other than that provided by the Longshoremen's and Harbor Workers' Compensation Act." Plaintiffs accordingly instituted this declaratory judgment action against Litton and Owens-Corning seeking a determination that Litton "has no independent right of indemnification against the Defendant, Owens-Corning Fiberglass, and that the

right of subrogation provided under the Longshoremen's and Harbor Workers' Compensation Act, and the case of *Allen v. Texaco,* 510 F.2d 977 (5th Cir.1975) are the exclusive remedies available to the Defendant" Litton.[1] Litton, in answer, maintained that it had "an independent *Burnside* action against any settling third party defendant who has not obtained Litton's consent to such settlement."

The district court determined that Litton's "only right against" Owens-Corning "is the right of subrogation pursuant to the Longshoremen's and Harbor Workers' Compensation Act" and that Litton "does not have a present or future independent right" against Owens-Corning of the type recognized in *Burnside.*[2] Litton has appealed contending that it does have an independent, *Burnside*-type remedy against Owens-Corning, governed by the general maritime law, and is not restricted to subrogation under the LHWCA. Plaintiffs and Owens-Corning, our appellees, contend that the LHWCA, especially its 1972 amendments, restricts Litton to the Act's subrogation rights, that Litton accordingly has no independent or *Burnside*-type indemnity action, and that, if the LHWCA does not so restrict Litton's rights, any independent rights Litton might have would arise under state law, and that under the law of the relevant state, Mississippi, Litton has no such rights.

## JURISDICTION

Although the subject matter jurisdiction issues which we consider were not raised by

---

1. The complaint also requested declaratory judgment respecting whether the sums to be paid in the proposed Owens-Corning settlements of plaintiffs' personal injury actions against it would be charged with plaintiffs' attorneys' fees in those actions before being available for application to Litton's LHWCA subrogation rights, and respecting the effect of consummating the proposed settlement on the continued right of certain of the plaintiffs to receive LHWCA compensation from Litton. However, we do not consider these issues, as they all presuppose the existence of a settlement which will be consummated, and the settlement was *conditional* on the judicial determination in this proceeding that Litton had no rights, apart from its LHWCA subrogation rights, against Owens-Corning in respect to the plaintiffs' asbestosis. Because we hold that, on

this record, subject matter jurisdiction to grant such a declaration has not been shown, so that the declaration cannot be sustained, it follows that the necessary condition for the settlements has not been met, and hence the proposed settlements will not take place. Accordingly, the remaining issues are moot and do not present a case or controversy. *See Halder v. Standard Oil Co.,* 642 F.2d 107 (5th Cir.1981); *Hendrix v. Poonai,* 662 F.2d 719 (11th Cir. 1981); *The Red Lobster Inns of America, Inc. v. New England Oyster House, Inc.,* 524 F.2d 968 (5th Cir.1975); *Tilley Lamp Co. v. Thacker,* 454 F.2d 805 (5th Cir.1972).

2. The district court then proceeded to rule on most of the other questions presented by plaintiffs' complaint. *See* note 1, *supra.*

the parties here or below, nor addressed by the district court, it is nevertheless our duty to address them *sua sponte. Superior Oil Co. v. Pioneer Corp.,* 706 F.2d 603 (5th Cir. 1983); Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 3522 at 48, 49. Moreover:

"... the rule is well settled that the party seeking to invoke the jurisdiction of a federal court must demonstrate that the case is within the competence of that court. The presumption is that a federal court lacks jurisdiction in a particular case until it has been demonstrated that jurisdiction over the subject matter exists. Thus the facts showing the existence of jurisdiction must be affirmatively alleged in the complaint." *Id.* at 45 (footnotes omitted).

*See also Epps v. Bexar-Medina-Atascosa Counties Water Improvement Dist. No. 1,* 665 F.2d 594, 595 (5th Cir.1982) ("... the party claiming federal subject matter jurisdiction bears the burden of proving it.").

The complaint here seeks to invoke jurisdiction on the following grounds:

"Jurisdiction of this cause of action is founded on the existence of a question arising under the laws of the United States of America and more particularly 33 U.S.C. Section 901, *et seq.* [LHWCA], 28 U.S.C. Section 1331 [federal question], 28 U.S.C. Section 1332 [diversity], 28 U.S.C. Section 1333 [admiralty], and 28 U.S.C. Section 2201 [declaratory judgment], and Rule 57 of the Federal Rules of Civil Procedure [declaratory judgment]."

■■■ In essence, then, subject matter jurisdiction is sought to be predicated on diversity of citizenship under 28 U.S.C. § 1332(a)(1), federal question jurisdiction under section 1331 as an action "arising under" the LHWCA,[3] and admiralty jurisdiction under section 1333(1). We proceed to examine these jurisdictional bases in the order indicated.[4]

## DIVERSITY

■■■ The required diversity under section 1332(a)(1) must be complete: where one or more plaintiffs sue one or more defendants, *each* plaintiff must be of a different citizenship than *each* defendant. *Powell v. Offshore Navigation, Inc.,* 644 F.2d 1063 (5th Cir.1981), *cert. denied,* 454 U.S. 972, 102 S.Ct. 521, 70 L.Ed.2d 391 (1981); Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 3605. This rule applies fully to parties joined under Fed.R.Civ.P. 19. *Id.,* § 3608 at 657, 658 ("... parties that are joined under Rules 19 and 20 or as additional parties to a permissive counterclaim must independently satisfy the jurisdictional requirements."). Moreover, it is settled that

"In determining whether diversity jurisdiction exists, the court is not bound by the way plaintiff formally aligns the parties in his original pleading. It is the court's duty to 'look beyond the plead-

---

**3.** The LHWCA itself provides no independent basis of jurisdiction apart from 28 U.S.C. section 1331. Other than the LHWCA no basis for federal question jurisdiction under section 1331 is asserted. It is settled that the admiralty or maritime nature of an action is not a basis for jurisdiction under section 1331. *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 769 (1959); *Powell v. Offshore Navigation, Inc.,* 644 F.2d 1063 (5th Cir.1981), *cert. denied,* 454 U.S. 972, 102 S.Ct. 521, 70 L.Ed.2d 391 (1981).

**4.** We give no separate consideration to 28 U.S.C. section 2201 and its implementing rule, Fed.R.Civ.P. 57. By its terms section 2201 authorizes a district court to grant declaratory relief only in respect to a controversy which is

"within its jurisdiction." As a noted authority has stated: "The operation of the Declaratory Judgment Act is procedural only. By passage of the Act, Congress enlarged the range of remedies available in the federal courts but it did not extend their subject matter jurisdiction. Thus, prior to deciding whether to exercise its discretion and allow a declaratory judgment action to be brought, the court must determine if jurisdiction and venue are proper. There must be an independent basis of jurisdiction, under statutes equally applicable to actions for coercive relief, before a federal court may entertain a declaratory judgment action." Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2766 at 731–734 (footnotes omitted).

ings, and arrange the parties according to their sides in the dispute.' ...

".....

"The generally accepted test of proper alignment is whether the parties with the same 'ultimate interests' in the outcome of the action are on the same side. This test is meant to ensure that there is 'an "actual," * * * "substantial," * * * controversy between citizens of different states, all of whom on one side of the controversy are citizens of different states from all parties on the other side.'" *Id.,* § 3607 at 639, 641 (footnotes omitted).[5]

This Court has long followed that principle, and has held that, when it relates to jurisdiction, it is our duty to notice party alignment and apply proper realignment *sua sponte* on appeal, and that such realignment is to be determined according to "the principal purpose of the suit and the primary and controlling matter in dispute." *Indemnity Insurance Company of North America v. The First National Bank at Winter Park, Florida,* 351 F.2d 519, 522 (5th Cir.1965). Applying these principles to the case at bar, it is evident that Owens-Corning must be realigned as a party plaintiff. The complaint reflects no dispute between plaintiffs and Owens-Corning, but rather reflects that they had essentially resolved their differences prior to the commencement of this action. In addition, with respect to the principal matters in issue, whether Litton has any *Burnside*-type claim against Owens-Corning or is restricted to its LHWCA subrogation remedies, both Owens-Corning and the plaintiffs are on one side of the dispute, taking identical positions, and Litton is on the other side, asserting the same position in opposition to each. The complaint alleges that both Owens-Corning and Litton are

Delaware corporations,[6] and hence realignment of Owens-Corning as a plaintiff results in one of the plaintiffs, Owens-Corning, being a citizen of the same state, Delaware, as the sole defendant, Litton, thus destroying the complete diversity necessary to jurisdiction under section 1332(a)(1).

## FEDERAL QUESTION

■ As previously observed (*see* note 3, *supra*), the only federal law cited as a basis for the complaint's assertion of federal question jurisdiction under 28 U.S.C. § 1331 is the LHWCA. Federal question jurisdiction, however, is not satisfied merely because "the dispute is in some way connected with a federal matter." *Cox v. International Union of Operating Engineers,* 672 F.2d 421, 422 (5th Cir.1982). Section 1331 requires that the suit be one "arising under" the Constitution or laws of the United States, and for this purpose "[a] suit arises under the law that creates the cause of action." *American Well Works Company v. Layne & Bowler Company,* 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed. 987 (1916); *Superior Oil Co. v. Pioneer Corp.,* 706 F.2d 603, 605 (5th Cir.1983). Federal law " 'must be an element, and an essential one, of the ... cause of action.' " *Superior Oil Co.* at 605. Moreover, what "determines jurisdiction" is the "nature of the claim" asserted, and "not the possible defenses to that claim." *Cox* at 422. "[T]he mere presence of a federal issue, specifically the anticipation of a federal defense, would not permit invocation of federal-question jurisdiction." *Superior Oil Co.* at 605. "[T]he well-pleaded complaint rule bars plaintiff from invoking original federal jurisdiction by anticipating in the complaint a defense that defendant will raise." Wright, Miller & Cooper, *Federal Practice and Procedure: Juris-*

---

**5.** *See also id.,* section 3605 at 618: "... the federal court must determine the position of each party on the matters in dispute, and align the parties according to their true interests, at which point the relationship of the parties to one another determines whether diversity jurisdiction still may be maintained." (Footnotes omitted.)

**6.** No other part of the record indicates that they are not each Delaware corporations.

While there is no allegation or showing of the state in which either Litton or Owens-Corning has its principal place of business, a lack of diversity by reason either of state of incorporation or of state of principal place of business defeats jurisdiction under section 1332(a)(1). *See* 28 U.S.C. section 1332(c); Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 3624 at 781, 782.

*diction* § 3566 at 434. "The rule that jurisdiction cannot be created by anticipating defenses in the complaint has been applied consistently by the courts." *Id.* at 435 (footnote omitted).

■■■■ Further, the well-pleaded complaint rule applies fully as much where the party invoking federal jurisdiction relies on federal law to preclude an anticipated state law defense as where he merely anticipates his adversary's invocation of a federal defense. *See Franchise Tax Board v. Construction Laborers Vacation Trust,* —— U.S. ——, ——, 103 S.Ct. 2841, 2846–2847, 77 L.Ed.2d 420, 431 (1983) ("... a federal court does not have original jurisdiction over a case in which the complaint presents a state-law cause of action, but also asserts that federal law deprives the defendant of a defense he may raise, [citations], or that a federal defense the defendant may raise is not sufficient to defeat the claim, [citation]."). Similarly, federal question jurisdiction is not aided by the fact that it is the removing defendant who relies on federal law to provide a defense. *Id.* Accordingly, application of the well-pleaded complaint rule does not turn on whether the party ultimately seeking to rely on federal substantive law is, or is not, the party invoking federal jurisdiction, but rather on whether federal substantive law forms an essential element of the cause of action itself, as distinguished from possible defenses thereto, respecting which federal jurisdiction is invoked.

Here plaintiffs do not assert a cause of action or claim under the LHWCA against Litton, but rather seek declaratory judgment concerning the effect of the LHWCA on claims Litton might otherwise have against Owens-Corning. The federal Declaratory Judgment Act, 28 U.S.C. § 2201, is procedural only, not substantive, and hence the relevant cause of action must arise under some other federal law for section 1331 to afford jurisdiction of a declaratory judgment suit. *See* note 4, *supra.* As Justice Frankfurter said for the Court in *Skelly Oil Co. v. Phillips Petroleum Co.,* 339

U.S. 667, 671, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950):

"'[T]he operation of the Declaratory Judgment Act is procedural only.' [citation]. Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction.... '[J]urisdiction' means the kinds of issues which give right of entrance to federal courts. Jurisdiction in this sense was not altered by the Declaratory Judgment Act."

■■■ Prior to the Declaratory Judgment Act, federal question jurisdiction extended only to causes of action, as distinguished from defenses thereto, arising under federal law. The Declaratory Judgment Act operates procedurally to broaden the class of litigants who might bring into federal court causes of action arising under federal law, as the availability of declaratory relief enables a party to achieve federal question jurisdiction over a suit to declare that a claim arising under federal law which another asserts against him is not valid. *Superior Oil Co.* at 607. Though the underlying cause of action which is thus actually litigated is the declaratory defendant's, not the declaratory plaintiff's, this does not violate the requirement that what must arise under federal law is the cause of action in issue itself (regardless of to whom it belongs) as distinguished from some defense to it. What is litigated in such a situation is "the precise issue which could have been litigated in federal court in a coercive action brought by" the declaratory defendant. Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2767 at 740. Accordingly, it does not involve federal question jurisdiction being predicated under the Declaratory Judgment Act solely upon a federal defense to a cause of action which does not itself arise under federal law.

In *Skelly Oil Co.* the Court observed that "a suit for a declaration of rights could [not] be brought into the federal courts merely because an anticipated defense derived from federal law," *id.* at 673, 70 S.Ct. at 880, and went on to state that:

"To sanction suits for declaratory relief as within the jurisdiction of the District Courts merely because, as in this case, artful pleading anticipates a defense based on federal law would contravene the whole trend of jurisdictional legislation by Congress, disregard the effective functioning of the federal judicial system and distort the limited procedural purpose of the Declaratory Judgment Act." *Id.* at 673–74, 70 S.Ct. at 880.

Similarly, in *Public Service Commission of Utah v. Wycoff Co.*, 344 U.S. 237, 248, 73 S.Ct. 236, 242–243, 97 L.Ed. 291 (1952), Justice Jackson, with whom six other Justices concurred, wrote:

"Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction in the District Court. If the cause of action, which the declaratory defendant threatens to assert, does not itself involve a claim under federal law, it is doubtful if a federal court may entertain an action for a declaratory judgment establishing a defense to that claim. This is dubious even though the declaratory complaint sets forth a claim of federal right, if that right is in reality in the nature of a defense to a threatened cause of action."

Wright, Miller & Kane, *supra,* in discussing whether there is federal question jurisdiction of a suit in which "a party seeks a declaration that he is immune, by virtue of federal law, from a nonfederal claim that the other party may have," labels as the "narrow view" that which denies such jurisdiction, in contrast to the "broader view" which sustains it. *Id., § 2767 at 742.* As to the latter, the authors state "The Supreme Court, however, seems quite clearly to have rejected that [broader] view." *Id.* at 742–43. While recognizing certain abstractly desirable features of the "broader view," the authors approve of the decisions rejecting it since "in view of the limited purpose that was claimed for the Declaratory Judgment Act when it was adopted, it would be a perversion of the statute if it were held to have extended federal question jurisdiction." *Id.* at 746 (footnote omitted). Commenting on the above-quoted language from *Wycoff,* this source states:

"Despite the Court's use of such words as 'doubtful' and 'dubious,' it seems clear that this is the law today, that the narrow view is the correct one, and that a historical test must be used to measure federal jurisdiction in declaratory actions. Therefore, *if, but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state created action, jurisdiction is lacking."* *Id.* at 744–45 (footnotes omitted; emphasis added).

While we are in agreement with these views, what is more important is that the Supreme Court has most recently reaffirmed the conclusion stated by Wright, Miller & Kane, quoting with approval the italicized portion of the language set out above. *Franchise Tax Board,* —— U.S. at ——, 103 S.Ct. at 2850, 77 L.Ed.2d at 435.[7]

---

7. We recognize that arguably there may exist some potential for theoretical tension between an extension of the views we express here and an extension of the decisions of this Court in the factually quite distinct cases of *Florida East Coast Railway Co. v. Jacksonville Terminal Co.*, 328 F.2d 720 (5th Cir.1964), *cert. denied,* 379 U.S. 830, 85 S.Ct. 59, 13 L.Ed.2d 38 (1964); *St. Louis Southwestern Railway Co. v. City of Tyler, Texas,* 375 F.2d 938 (5th Cir.1967); and *Braniff International, Inc. v. Florida Public Service Commission,* 576 F.2d 1100 (5th Cir.1978). While in the circumstances there presented those cases may represent a more expansive view of federal question jurisdiction than that taken by certain other courts, *see St. Louis Southwestern* at 941 (indicating conflict with Second and Seventh Circuit decisions) and *United Airlines v. Division of Industrial Safety,* 633 F.2d 814 (9th Cir.1980), *cert. denied,* 454 U.S. 944, 102 S.Ct. 485, 70 L.Ed.2d 255 (1981), we do not read them as being in conflict with the analysis made in the text of this opinion or with the principle of *Franchise Tax Board* that federal question jurisdiction is not shown by a declaratory judgment action in which the federal claims would arise only by way of defense. In *Florida East Coast Railway Co.* this Court dealt with an action to enforce a contract which had been specifically approved by the Interstate Commerce Commission, and ap-

Accordingly, if the cause of action, which the complaint sought declaratory judgment that Litton did not have, was a cause of action assertedly arising under the LHWCA, then federal question jurisdiction would be present. On the other hand, if that cause of action was not one claimed to arise under the LHWCA, but was rather one which, if asserted in a suit by Litton would not suffice for federal question jurisdiction and as to which the LHWCA would merely provide a claimed defense, then the complaint here was insufficient to sustain section 1331 jurisdiction. We think that the latter characterization is plainly the correct one. The complaint alleges that Litton, in refusing to consent to the settlements, took the position "that it has an independent right of indemnification against said Defendant, Owens-Corning Fiberglass, other than that provided by the Longshoremen's and Harbor Workers' Compensation Act," and seeks declaratory judgment that "Litton has no independent right of indemnification against the Defendant, Owens-Corning Fiberglass, and that the right of subrogation provided under the Longshoremen's and Harbor Worker's Compensation Act, and the case of *Allen v. Texaco*, 510 F.2d 977 (5th Cir.1975) are the exclusive reme-

dies available to the Defendant" Litton. Litton in its answer took the position that it had "an independent *Burnside* action against any settling third party defendant who has not obtained Litton's consent to such settlement." The district court characterized this action as follows:

"In the suit seeking declaratory judgment, the plaintiffs have asked this Court to declare that their employer, Litton Systems, Inc., has no rights against the third party defendants other than those provided by the Longshoremen's and Harbor Workers' Compensation Act."

None of the parties have questioned the accuracy of the district court's description.[8]

Moreover, it is clear that the *Burnside* cause of action which Litton asserted was available to it, is not a cause of action arising under the LHWCA, but is rather, as all parties and the district court recognized, a cause of action "independent" of the Act. This is also clear from the Supreme Court's opinion in *Burnside*. There the Court states:

"This case thus presents two questions. First, does § 33 of the Act exclude whatever other rights of action the stevedoring contractor might have against the

peared to regard that approval as in effect making the contract rights sought to be enforced federal rights. Nothing comparable is present here, and hence *Florida East Coast Railway Co.* is inapplicable. *St. Louis Southwestern* dealt with an ICC approved lease, and the Court regarded the jurisdictional issues before it as being governed by *Florida East Coast Railway Co.* In both of those cases, as well as in *Braniff International*, the plaintiff sought, and was entitled to, *injunctive* relief (as well as declaratory relief). In *St. Louis Southwestern* (*id.* at 941) and *Braniff International* (*id.* at 1105) the injunctive relief was sought against imminently threatened *state* action which interfered with federal rights. The latter two cases thus appear to be within the exception to *Franchise Tax Board* noted in *Shaw v. Delta Air Lines, Inc.*, —— U.S. ——, ——, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490, 500 n. 14 (1983) as follows: "It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. [citation]. A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Su-

premacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." Here, no injunction was sought and no state action, actual or threatened, was alleged, proved or found. Moreover, there was no allegation, evidence or finding that Litton had threatened to sue (or take any other action against) Owens-Corning (or any of the plaintiffs). All Litton did (or was alleged to have done) was to refuse the request made of it to approve the settlements, and to take the position that it had *Burnside* rights against Owens-Corning independent of its (Litton's) LHWCA subrogation rights. Accordingly, *Shaw, St. Louis Southwestern* and *Braniff International* are inapplicable.

8. We note that the district court refers to "the third party defendants" in the plural. Actually Owens-Corning was the only such party before the court in this case and the only party as to whom such a declaration was asked, though doubtless the plaintiffs hoped that the ruling they sought would also be applicable to the other defendants in the personal injury actions.

shipowner for compensation payments to an employee or his representative? Second, if statutory subrogation is not an exclusive remedy, does the shipowner owe the stevedoring contractor any duty whose breach will give rise to a direct action?" 394 U.S. 404 at 411–412, 89 S.Ct. at 1148–1149.

Answering the first question in the negative, the *Burnside* Court observed that "the legislative grant of a new right [LHWCA employer subrogation] does not ordinarily cut off or preclude other *nonstatutory* rights in the absence of clear language to that effect" and that the Act "does not affect the *independent* relationships between the stevedoring contractor and the shipowner." *Id.* at 412, 413, 89 S.Ct. at 1149 (emphasis added). The Court described its holding on this point as being that the Act "is not the exclusive source of the stevedoring contractor's remedies against the shipowner . . . ." *Id.* at 422, 89 S.Ct. at 1154. In giving an affirmative answer to the second question, the Court observed that it was "not disputed" that the stevedore would have "a direct action sounding in tort" against the shipowner for negligently damaging the stevedore's equipment, and could "see no reason why the shipowner's liability does not *in like fashion* extend to" the stevedore's foreseeable "compensation" liabilities to a longshoreman whose injury "was occasioned by the shipowner's breach of his *duty to the stevedoring contractor.*" *Id.* at 415, 89 S.Ct. at 1150 (emphasis added). The Court described its holding in this respect as being "that federal *maritime law*

does impose on the shipowner a *duty to the stevedoring contractor* of due care . . . and does recognize *a direct action in tort* against the shipowner to recover the amount of compensation payments occasioned by the latter's negligence" (*id.* at 417, 89 S.Ct. at 1151–1152; emphasis added), and that the stevedore "may have a cause of action *in tort* for the compensation payments caused by the shipowner's negligence." *Id.* at 422, 89 S.Ct. at 1154 (emphasis added).[9]

The *Burnside* opinion's reference to "nonstatutory rights," to the fact that the LHWCA does not affect the "independent" relationship between the stevedore and the shipowner, and to the latter's duty *to* the former, arising from "federal maritime law" so as to give the stevedore "a direct action in tort" against the shipowner for the latter's negligence "in like fashion" as such an action would lie for the shipowner's negligent damage to the stevedore's equipment, all make it plain beyond any question that the cause of action so recognized is not created, expressly or impliedly, by the LHWCA and does not arise from or depend on any rights or obligations which the LHWCA imposes as between the employer and the offending third party. *See also* 2A Larson, *The Law of Workmen's Compensation* § 77.11 at 14–770, 14–771; § 77.20; § 77.21 at 14–792. Hence, it is plain that *if* Litton has a *Burnside*-type cause of action against Owens-Corning, it is not one "arising under" the LHWCA for purposes of section 1331.[10] Therefore, a declaratory

**9.** *Burnside* also states "[i]n holding that the stevedoring contractor has *a direct action in tort,* we do not preclude the possibility of *a direct action* under some other theory." *Id.* at 418, 89 S.Ct. at 1152, emphasis added. The Court then specifically considered, but declined to resolve, the possibilities of contractual and quasi-contractual actions by the compensation-paying stevedore against the wrongdoer shipowner, indicating, however, that its prior decisions did not foreclose such actions. *Id.* at 418–421, 89 S.Ct. at 1152–1153.

**10.** The fact that the damages Litton would seek to recover from Owens-Corning in such a *Burnside*-type action are for sums Litton has paid its employees in LHWCA compensation does not

mean that Litton's claim arises under the LHWCA for section 1331 purposes. There is no dispute concerning Litton's obligation to pay the compensation payments it has paid (which in several instances exceed the settlement amounts). In these circumstances, this relationship between the LHWCA and Litton's questioned *Burnside* cause of action is too indirect, collateral and remote for the *Burnside* cause of action to be considered as one "arising under" the LHWCA for purposes of federal question jurisdiction. *See Gully v. First National Bank in Meridian,* 299 U.S. 109, 118, 57 S.Ct. 96, 100, 81 L.Ed. 70 (1936) (". . . countless claims of right can be discovered to have their source or their operative limits in the provisions of a federal statute . . . . To set

judgment suit to determine that Litton has no such cause of action likewise does not arise under the LHWCA. And, it is immaterial for this purpose that plaintiffs and Owens-Corning contend that the LHWCA, with or without its 1972 amendments, bars such an action, as this is the sort of defensive issue which cannot form the basis of section 1331 jurisdiction.[11] Accordingly, neither the complaint on its face nor the proceedings below demonstrate the presence of federal question jurisdiction.

## ADMIRALTY

We now turn to the final basis on which jurisdiction was sought to be predicated, namely section 1333(1)'s provision respecting "any civil case of admiralty or maritime jurisdiction." Jurisdiction on this basis depends on whether the substantive issues which this suit seeks to resolve—the existence and nature of Litton's non-LHWCA rights against Owens-Corning—are governed by maritime law.

In *Burnside* it was held that the general "federal maritime law" governed the stevedore's non-LHWCA rights against the shipowner and furnished the former "a direct action in tort against the shipowner to recover the amount of compensation payments occasioned by the latter's negligence." *Id.* at 417, 89 S.Ct. at 1151–1152. But *Burnside* involved a totally maritime context, namely personal injury on board a ship in navigable waters in the course of performing unloading operations. Such an injury meets both the "situs" and the "traditional maritime activity" tests. *See Atlantic Transport Co. v. Imbrovek,* 234 U.S. 52, 61–62, 34 S.Ct. 733, 735, 58 L.Ed. 1208 (1914); *Executive Jet Aviation v. City of Cleveland,* 409 U.S. 249, 258, 268, 93 S.Ct. 493, 499, 504, 34 L.Ed.2d 454 (1972). Here, the situation is quite different. Neither the complaint nor the proceedings below disclose the exact nature of any plaintiff's employment with Litton, other than that it was shipyard work covered by the LHWCA, presumably work as a "ship repairman, shipbuilder, ... [or] shipbreaker" under section 2(3) of the LHWCA (33 U.S.C. § 902(3)), performed either on navigable waters or on adjoining piers or dry docks or

bounds to the pursuit, the courts have formulated the distinction between controversies that are basic and those that are collateral, between disputes that are necessary and those that are merely possible."); *Cox v. International Union of Operating Engineers,* 672 F.2d 421, 422 (5th Cir.1982) (claim must be " '... founded "directly" upon federal law.' "). As stated in Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 3562 at 408, 409 "... for federal question jurisdiction to exist, the federal law must be a direct element in the plaintiff's claim ... it is not enough that it comes in remotely or indirectly. This explains, for example, the cases holding that jurisdiction is lacking in a suit to establish the title to land merely because the title can be traced back to a federal grant that is no longer in dispute." (Footnotes omitted.) *See also Shulthis v. McDougal,* 225 U.S. 561, 569, 32 S.Ct. 704, 706, 56 L.Ed. 1205 (1912); *Huckins v. Duval County, Florida,* 286 F.2d 46 at 49 (5th Cir.1960), *cert. denied,* 366 U.S. 945, 81 S.Ct. 1673, 6 L.Ed.2d 856 (1961); *Roecker v. United States,* 379 F.2d 400 at 407–08 (5th Cir.1967), *cert. denied,* 389 U.S. 1005, 88 S.Ct. 563, 19 L.Ed.2d 600 (1967); *Mays v. Kirk,* 414 F.2d 131 at 134 (5th Cir.1969).

**11.** This Court has held that the 1972 LHWCA amendments do not abrogate the *Burnside* cause of action, at least not as against a non-

vessel third party. *Olsen v. Shell Oil Co.,* 708 F.2d 976, 981–82 (5th Cir.1983). *See also Crescent Wharf & Warehouse Co. v. Barracuda Tanker Corp.,* 696 F.2d 703, 706–07 (9th Cir. 1983). With respect to the post-1972 indemnity or contribution remedy of a nonvessel third party against the stevedore-LHWCA employer, *see Pippen v. Shell Oil Co.,* 661 F.2d 378, 386–88 (5th Cir.1981). These authorities, however, go to the *merits* of plaintiffs' contentions respecting the LHWCA, not to whether those contentions (whatever their merits) stand in such a relation to the action that it can be said to arise under the LHWCA for purposes of section 1331. Wright, *Law of Federal Courts* 102 (4th Ed.1983). When the judgment below was rendered no federal appellate court which had expressly spoken to the point had held that *Burnside* survived the 1972 LHWCA amendments, and the Supreme Court has not yet expressly so *held.* Accordingly, we do not resolve the federal question jurisdiction issue on the basis of any possible "insubstantiality" in plaintiffs' assertions concerning the LHWCA, particularly as amended in 1972, preventing "independent" third-party indemnity actions by employers. *See* Wright, Miller & Cooper, *Federal Practice & Procedure: Jurisdiction* § 3564.

other adjoining area customarily used by Litton in "repairing, or building a vessel," under section 3(a) of the LHWCA (33 U.S.C. § 903(a)). But whether any of the asbestos exposure, or the relevant work, took place on or over navigable waters, as opposed to on land, or whether it occurred in the course of the construction of ships, or their demolition or repair, and, if the latter, the nature of the repair and whether the ships were completely withdrawn from navigation, is not even inferentially alleged in the complaint or in any way reflected by the record. Moreover, aside from the implication that in the course of their employment with Litton plaintiffs were exposed to Owens-Corning asbestos containing insulation products, there is nothing in the complaint, or elsewhere in the record, indicating the nature or use of such products, whether they were used in ships or in buildings on land and whether their design was particularly for maritime purposes, or the relationship between Owens-Corning and Litton. Thus, it is evident that *Burnside* does not, of itself, establish that maritime law controls with respect to Litton's non-LHWCA rights against Owens-Corning. Nor does *Olsen v. Shell Oil Co.,* 708 F.2d 976 (5th Cir.1983) point the way, for there we held that the OCSLA (43 U.S.C. § 1333(a)) expressly mandated the application of state law, and here OCSLA is plainly inapplicable.

Moreover, we are unable to conclude that simply because Litton's damages arise from its having to pay LHWCA compensation that therefore Litton's extra-LHWCA rights against Owens-Corning are necessarily governed by maritime law. We have previously observed that the rights of Litton under consideration are "nonstatutory" and arise independently of rather than under the LHWCA. And, we have noted the indirect, collateral and remote nature of the nexus between the LHWCA and Litton's referenced rights (*see* note 10, *supra*). It is true that this Court has held an indemnity claim to be maritime in nature where the liability of the indemnitee was maritime,

notwithstanding that the relationship between the indemnitor and the indemnitee may have been generally nonmaritime. *See Sperry Rand Corp. v. Radio Corp. of America,* 618 F.2d 319 (5th Cir.1980); *Watz v. Zapata Off-Shore Company,* 431 F.2d 100, 118 (5th Cir.1970). But these decisions do not establish that because Litton's liability to its employees was under the LHWCA, therefore Litton's non-LHWCA rights against Owens-Corning must be governed by maritime law.

In *Sperry Rand* and *Watz* the injured party (occupying a position analogous to that of the employee-plaintiffs, here) would have had a maritime suit for the injuries in question (the asbestosis, here) against the indemnitor (Owens-Corning, here) as well as against the indemnitee (Litton, here). For the reasons set forth below in more detail, the complaint and the record here do not demonstrate that the actions of these employee-plaintiffs against Owens-Corning, on account of asbestosis incurred while working for Litton, would be governed by maritime law. Moreover, if the employee's action against the third party is nonmaritime, then *Sperry Rand* and *Watz* would equally point to the third party's indemnity action against the employer as being nonmaritime,[12] and in that event it would also seem that the employer's extra-LHWCA rights against the third party respecting the same occurrence should likewise be nonmaritime. Also counseling against looking simply to the nature of the employee's rights against the employer is the fact that *Burnside* likens the employer's extra-LHWCA rights against the third party to the rights the employer would have respecting damage caused by the third party to the employer's equipment, and bases the third party's liability on a duty owed directly to the employer.

Additionally, the "maritime law" considered in *Sperry Rand* and *Watz,* as respects both the indemnitee's liability to the injured party and the indemnitor's liability

---

**12.** We have expressed the view that the LHWCA does not restrict such actions by non-

vessel third parties. *See Pippen v. Shell Oil Co.,* 661 F.2d 378, 386–88 (5th Cir.1981).

to the indemnitee, was the traditional, judge-made maritime law. Here, by contrast, the indemnitee's (Litton's) liability is under a specific, substantive statute, the LHWCA. The Congressional power, under Article III, section 2, of the Constitution, to make substantive admiralty law is broader than the class of controversies otherwise within the federal courts' general admiralty jurisdiction under 28 U.S.C. § 1333 and its predecessors. *See Detroit Trust Co. v. Steamer Thomas Barlum,* 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176 (1934); *Richard Bertram & Co. v. The Yacht Wanda,* 447 F.2d 966 (5th Cir.1971). The Supreme Court in *Burnside* held that the LHWCA did not affect either the "nonstatutory rights" of the LHWCA employer against a third party injuring a covered employee of that employer or the "independent relationships" between the employer and the third party. Moreover, when in the 1972 LHWCA amendments Congress, for the first time, expressly addressed the extra-Act rights as between the employer and third parties, by adding section 5(b) of the Act (33 U.S.C. § 905(b)), it spoke only in terms of limiting the employer's liability "to the vessel" and limiting extra-Act "remedies against the vessel." *See Olsen v. Shell Oil Co.,* 708 F.2d 976, 981–82 (5th Cir.1983); *Pippen v. Shell Oil Co.,* 661 F.2d 378, 386–88 (5th Cir.1981). Under the definition contained in the Act (33 U.S.C. § 902(21)), as well as the common understanding of the term, it is evident that Owens-Corning is not a "vessel," and there is nothing in the complaint or otherwise in the record suggesting the contrary. In these circumstances, a holding that the LHWCA imparts to such extra-Act rights as Litton may have against Owens-Corning a maritime character they would not otherwise possess, clearly runs against the grain of the Supreme Court's opinion in *Victory Carriers Inc. v. Law,* 404 U.S. 202,

92 S.Ct. 418, 30 L.Ed.2d 383 (1971). There the Court stated:

"We are not inclined at this juncture to disturb the existing precedents and to extend shoreward the reach of the maritime law further than Congress has approved. We are dealing here with the intersection of federal and state law. As the law now stands, state law has traditionally governed accidents like this one. To afford respondent a maritime cause of action would thus intrude on an area that has heretofore been reserved for state law, [and] would raise difficult questions concerning the extent to which state law would be displaced or pre-empted .... [W]e should proceed with caution in construing constitutional and statutory provisions dealing with the jurisdiction of the federal courts." *Id.* at 211–212, 92 S.Ct. at 425.

Accordingly, we hold that whether Litton's extra-LHWCA rights against Owens-Corning are governed by maritime law is not to be determined simply on the basis that Litton's liability to its employees arises under the LHWCA. To answer the question of whether Litton's rights are maritime, we accordingly turn to the general, judge-made maritime law.

It has long been held that neither ship construction nor supplying materials for that purpose is a maritime business, and this is so even though the endeavor is undertaken when the hull lies in navigable waters. *Thames Towboat Company v. The Schooner Francis McDonald,* 254 U.S. 242, 41 S.Ct. 65, 65 L.Ed. 245 (1920). On the other hand, ship repair has been viewed as maritime activity. *North Pacific Steamship Company v. Hall Brothers Marine Railway & Shipbuilding Company,* 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510 (1919). With respect to torts, however, formerly it was generally stated that "situs" was the sole test, so that if the tort "took effect" [13] on navigable

---

13. Where the tort "took effect" for this purpose was not always clear. *See Executive Jet Aviation v. Cleveland,* 409 U.S. 249, 266, 267, 93 S.Ct. 493, 503, 504, 34 L.Ed.2d 454 (1972). In *Smith & Son v. Taylor,* 276 U.S. 179, 48 S.Ct. 228, 72 L.Ed. 520 (1928) where the longshore-

man was hit on the dock and fell into navigable waters and drowned, the "situs" test was not satisfied. On the other hand, we have clearly held that the situs requirement is satisfied where a defectively designed product furnished in the construction of a ship later causes it to

waters it was governed by admiralty law, but otherwise it was not. Executive Jet Aviation v. City of Cleveland, 409 U.S. 249, 266, 93 S.Ct. 493, 503, 34 L.Ed.2d 454 (1972). Thus, despite the maritime nature of both the injured party's activity and the activity causing the injury, the tort was not maritime if it took effect on land.[14] Smith & Son v. Taylor, 276 U.S. 179, 48 S.Ct. 228, 72 L.Ed. 520 (1928). See also, e.g., Duluth & Superior Bridge Co. v. The Troy, 208 U.S. 321, 28 S.Ct. 416, 52 L.Ed. 512 (1908).[15] On the other hand, even if the injured party was not engaged in maritime activity, the tort was maritime if it took effect on navigable waters. Grant Smith-Porter Ship Co. v. Rohde, 257 U.S. 469, 42 S.Ct. 157, 66 L.Ed. 321 (1922) (injury to ship construction worker on board ship being constructed in navigable waters is maritime tort; but since ship construction contract "was non-maritime" and "neither [plaintiff's] general employment, nor his activities at the time, had any direct relation to navigation or commerce," state workmen's compensation law could contractually apply to the exclusion of maritime law). As applied to torts, however, this body of law was significantly

clarified by the Supreme Court's unanimous opinion in Executive Jet. There the Court held that in order for a tort to be maritime, it not only had to meet the "situs" requirement but it was "also" necessary "that the wrong bear a significant relationship to traditional maritime activity." Id. 409 U.S. at 268, 93 S.Ct. at 504. In Foremost Ins. Co. v. Richardson, 457 U.S. 668, 671, 672, 674, 102 S.Ct. 2654, 2657, 2658, 73 L.Ed.2d 300, 304–306 (1982) the Court reaffirmed the rule of Executive Jet.

But Executive Jet did not substitute the "significant relationship" test for the "situs" test in tort matters; rather, it retained the "situs" requirement and added the "significant relationship" requirement. As we recently stated in Smith v. Pan Air Corp., 684 F.2d 1102, 1108 (5th Cir.1982), in holding a tort to be without the district court's maritime jurisdiction because it did not have a maritime situs, "both Executive Jet and Richardson lead ineluctably to the conclusion that maritime locality is still an indispensable element of maritime jurisdiction . . . ." We have likewise held that the rule of Executive Jet applies to the Admi-

sink or collide while underway in navigable waters. Jig The Third Corp. v. Puritan Marine Insurance Underwriters Corp., 519 F.2d 171, 174 (5th Cir.1975), cert. denied, 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976); Sperry Rand Corp. v. Radio Corp. of America, 618 F.2d 319 (5th Cir.1980). See also Smith v. Pan Air Corp., 684 F.2d 1102, 1111 (1982).

14. Injuries to a seaman, however, did not have to meet the "situs" test if occurring in the service of the seaman's vessel. See Executive Jet, 409 U.S. at 259, 260, 93 S.Ct. at 500–501. Although longshoremen have been considered the warranty of seaworthiness while on a vessel in navigable waters, Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Atlantic Transport Co. v. Imbrovek, 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208 (1914), and were considered "seamen" in certain other respects, International Stevedoring Co. v. Haverty, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157 (1926), they were not seamen for purposes of the "seaman" exception to the "situs" requirement. Smith & Son v. Taylor, 276 U.S. 179, 48 S.Ct. 228, 72 L.Ed. 520 (1928). After the 1948 Extension of Admiralty Act, 46 U.S.C. § 740, longshoremen on the dock injured by the vessel could claim unseaworthiness, Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297

(1963), but, again, they remained outside the "seaman" exception to the "situs" requirement. Victory Carriers v. Law, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971). A ship repairman performing ordinary repairs on an operable vessel in navigable waters receives the warranty of seaworthiness, Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953), but not if the repair work is not of the kind ordinarily performed by a ship's crew or the ship is not in a navigational status. See United New York and New Jersey Sandy Hook Pilots Association v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959); West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959); Waganer v. Sea-Land Service, Inc., 486 F.2d 955 (5th Cir.1973).

15. Though the 1948 Extension of Admiralty Act rendered the precise holdings of these cases obsolete, see Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963), they otherwise remained valid for the general principle for which cited. See Victory Carriers; Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co., 644 F.2d 1132, 1135 (5th Cir.1981), cert. denied, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981).

ralty Extension Act. *Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co.,* 644 F.2d 1132, 1135 (5th Cir.1981), *cert. denied,* 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981).

On the "situs" side, then, it is evident that torts which before *Executive Jet* were nonmaritime, as not having taken effect on navigable waters, remain nonmaritime today, absent being expressly made maritime by statute. Thus it continues to be true that, in the absence of contrary legislation, "[a]dmiralty jurisdiction" does not "extend to accidents on piers, jetties, bridges, or even ramps or railways running into the sea." *Rodrigue v. Aetna Casualty & Surety Co.,* 395 U.S. 352, 360, 89 S.Ct. 1835, 1839, 23 L.Ed.2d 360 (1969). However, where the tort was previously maritime only because of situs, the activity being nonmaritime, *Executive Jet* now requires that the tort be considered nonmaritime. Thus, in the post-*Executive Jet* era we have held that an injury to a ship construction worker on board a ship under construction and lying in navigable waters is not a maritime tort. *Hollister v. Luke Construction Co.,* 517 F.2d 920, 921 (5th Cir.1975).

Accordingly, it seems plain that if a plaintiff's asbestosis arose during employment either on land, or while working on "ships" which though lying in navigable waters were still under construction and incomplete, the injury would be a nonmaritime one.[16] On the other hand, if the asbestosis arose while performing ship repair work on completed vessels lying in navigable waters, then traditional principles would apparently label the injury as maritime. However, the complaint does not allege, nor does the record indicate, that any of the exposure was either in the course of ship repair work or on navigable waters.[17]

The Fourth Circuit considered several issues closely related to those before us in three opinions rendered in 1981. *Glover v. Johns-Manville Corp.,* 662 F.2d 225 (4th Cir. 1981); *White v. Johns-Manville Corp.,* 662 F.2d 234 (4th Cir.1981), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 3191 (1982) ("*White II*"); *White v. Johns-Manville Corp.,* 662 F.2d 243 (4th Cir.1981) ("*White I*"). *White II* held that shipyard workers who contracted asbestosis from installing "asbestos insulation materials during ship construction and repair" that was "performed at both the shipyard and dry dock areas as well as aboard the vessels while they were located on navigable waters" stated a maritime tort claim against the manufacturers of the products, as these "were designed, advertised and marketed as maritime asbestos products." *Id.* at 239, 240. Judge Widener's concurring

---

**16.** Arguably, if the action were contractual, rather than in tort, a shoreside "injury" might theoretically be maritime to the extent it related to ship repair, as opposed to ship construction, since ship repair contracts are maritime. Here, however, there is no suggestion of any asserted contractual basis of recovery or of any contractual relation between Owens-Corning and either Litton or the plaintiffs.

**17.** Hence, we need not resolve the question of whether a "land-based" wrong on the part of Owens-Corning subjects it to maritime law in a *Burnside*-type suit by Litton where the employee's exposure arose from ship repair work on completed vessels lying in navigable waters. Our decisions giving a maritime character to land-based torts do not involve industrial diseases, and the maritime character of the ultimate injury, such as ship collision or sinking while actually underway on navigable waters, see *Jig The Third Corp. v. Puritan Marine Insurance Underwriters Corp.,* 519 F.2d 171, 174 (5th Cir.1975), *cert. denied,* 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976); *Sperry Rand Corp. v. Radio Corp. of America,* 618 F.2d 319 (5th Cir.1980); *In Re Motor Ship Pacific Carrier,* 489 F.2d 152, 156 (5th Cir.1974), *cert. denied,* 417 U.S. 931, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974), was much stronger in those instances than in the case of a docked vessel undergoing a major overhaul. The ship repairman "seaworthiness" cases cited in note 14 above indicate the relevance in that connection of both the nature of the repair work and the navigational status of the vessel. *Waganer v. Sea-Land Service, Inc.,* 486 F.2d 955 (5th Cir. 1973) states with respect to the nature of the work test that the relevant question is "whether the work being done by ... [the shipyard] employees *as a group* is that ordinarily done by seamen." *Id.* at 959 (emphasis added). Of course, these cases assumed general maritime law applied, and were simply concerned with seaworthiness; on the other hand, they did not involve actions against third-party land-based suppliers for occupational diseases.

opinion relied on the fact that the plaintiffs claimed "that at least 90% and as much as 97% of their exposure to the manufacturers' products occurred on navigable waters." *Id.* at 241, 242.

*White I* dealt with the manufacturer's indemnity claims against the shipyard, and held that insofar as these claims were contractual or based on an implied warranty assertedly arising from the purchase contracts they were non maritime, but insofar as they were tort claims they were maritime because the workers' claims against the manufacturer were maritime. *Id.* at 247. *Glover* also involved asbestos manufacturers' indemnity claims against the shipyard employer, though in this instance the employer was the United States. As respects the tort-based indemnity claims, Judge Widener's opinion indicates their maritime nature was uncertain since the situs of the exposure was not established as being on navigable waters. *Id.* at 229 n. 4. The opinion also indicates that the contractual indemnity claims might be maritime, apparently on the theory that they may have related to ship repair. *Id.* at 232 and n. 9.

Subsequently, similar issues have been considered by the Ninth, Second and First Circuits. *Owens-Illinois v. United States District Court,* 698 F.2d 967 (9th Cir.1983); *Keene Corp. v. United States,* 700 F.2d 836 (2d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *Austin v. Unarco Industries, Inc.,* 705 F.2d 1 (1st Cir.1983), *cert. dismissed,* —— U.S. ——, 104 S.Ct. 34, 77 L.Ed.2d 1454 (1983).

In *Owens-Illinois* the issue was whether the former shipyard worker's asbestosis suit against the asbestos material manufacturer was in admiralty for jury trial purposes. The plaintiff alleged exposure while doing ship construction work on ships that "were launched but before they were completed." *Id.* at 969. The opinion recognizes that under the pre-*Executive Jet* law torts on partially constructed ships lying in navigable waters were maritime because of their situs, even though the nature of the work, ship construction, was not maritime. 698

F.2d at 969, 970. However, the Ninth Circuit concluded that under *Executive Jet* such a tort was not maritime, as it lacked the required "maritime relationship," since ship construction contracts were not maritime. Relying in part on our opinion in *Hollister,* the court stated "the torts alleged here, arising solely in the process of new ship construction, lack the 'maritime flavor' necessary to invoke the jurisdiction of the federal courts under 28 U.S.C. § 1333(1)." 698 F.2d at 970. The court noted that *White II* was "perhaps distinguishable" since it involved ship repair, but went on to express its disagreement with *White II* insofar as it might hold that torts on ships under construction lying in navigable waters were maritime. *Id.* at 971. Stating its view that "torts occurring during the construction of new vessels are no more related to traditional maritime activity than are disputes arising out of contracts for ship construction," the court elected to follow *Hollister* insofar as it might conflict with *White II. Id.*

We are in agreement with *Owens-Illinois. White II's* rationale that because the products "become an appurtenance, or integral part, of the ship," therefore their installation "has a direct effect on marine navigation and commerce," 662 F.2d at 239, seems contrary to the rule that ship construction contracts are not maritime and to the statement in *Grant Smith-Porter Ship Co. v. Rohde,* 257 U.S. 469, 42 S.Ct. 157, 66 L.Ed. 321 (1922), that neither a ship construction worker's "general employment" nor his work on an incomplete ship lying in navigable waters "had any direct relation to navigation or commerce." *Id.* at 476, 421 S.Ct. at 158. *White II* gives no express consideration to these principles.

In *Keene* the Second Circuit considered several extremely general indemnity claims by asbestos products manufacturers against the United States in its capacity as a shipyard employer. The court held that these claims were nonmaritime, relying in part on our *Hollister* decision that "a tort arising out of work on an uncompleted vessel ... fall[s] outside admiralty jurisdiction," and

on its view that not only ship building contracts but also "contracts for services to a vessel laid up and out of navigation" were nonmaritime. *Keene* at 844. *Keene* "expressly decline[d] to follow the reasoning of" *White I, White II* and *Glover. Keene* at 844, 845. However, *Keene* also relied on the absence of allegation that the products were "designed specifically for maritime use," *id.* at 844, and indicated disapproval of the reasoning in *Sperry Rand* that this was not a critical factor in a ship collision products liability suit. *Keene* at 845.

The most recent of this series of cases is the First Circuit's *Austin* decision, dealing with a shipyard worker's asbestosis claims against manufacturers of asbestos products to which he was exposed in his work. The First Circuit held the claims were nonmaritime, and rejected the reasoning and result of *White II,* although it also expressed partial disagreement with the analysis made in *Owens-Illinois* and *Keene. Austin* at 9. While the Fourth and Second Circuits, in *White II* and *Keene,* attached significance to whether the products were specially designed for maritime use, the First Circuit declined to do so, relying, *inter alia,* on our *Sperry Rand* decision. *Austin* at 9, 10. The court in *Austin* also refused to give controlling significance to whether the activity was ship construction as opposed to ship repair, although it agreed both that the "distinction between ship building and ship repair may shed light on the nature of the injured worker's activity and thus be relevant to the inquiry required by *Executive Jet,*" and, citing *Owens-Illinois, Hollister* and *Rohde,* that "the contract cases are relevant . . . to distinguish between workers whose connection to maritime activity . . . [is] too tenuous to warrant displacing state law." *Austin* at 10 n. 4, 12 n. 5. But the court felt that overemphasis on the construction/repair dichotomy "may lead to arbitrary distinctions." *Id.* at 12 n. 5. What was controlling in *Austin* were the same sort of factors that were controlling in the seaworthiness cases, *id.* at 12, 13, namely that the ships were either incomplete or laid up so as to be "temporarily incapable of acting as" ships, that the work

"was a major project involving specialized tools and skills, both in kind and magnitude far beyond that traditionally done by a ship's crew," and that "the hazards exposed could not be said to be peculiar to maritime navigation." *Id.* at 14.

Summarizing, we observe that none of these decisions of our four sister circuits has held that shipyard worker asbestosis is maritime for extra-LHWCA purposes merely because it is covered by LHWCA. Even *White II* relied on the fact that the exposure there occurred on navigable waters, and perhaps also on the fact that it occurred during ship repair as well as construction. For the reasons previously stated, the LHWCA is not decisive of the maritime nature of Litton's *Burnside*-type claims. We agree with the First Circuit's statement that "[n]or does the legislative provision of coverage through the LHWCA supply an affirmative thrust for a judicial weakening of *Executive Jet*'s requirement of 'traditional maritime activity.'" *Id.* at 14. Similarly, none of these decisions of our sister circuits suggests abandonment of the requirement that the exposure have a situs on navigable waters, and, as explained above, we believe our prior decisions and those of the Supreme Court compel the conclusion that such a situs is indispensable. While the situation is perhaps slightly less clear as regards exposure during ship construction on navigable waters, we are bound by *Hollister* and in any event believe that it and *Owens-Illinois* are correct and follow from *Executive Jet* and the long-standing rule that ship construction contracts are not maritime. If *White I, White II,* or *Glover* are to the contrary, we respectfully disagree. In reaching all these conclusions we are also influenced by the considerations expressed in *Austin:*

"We are, therefore, guided by the insistence of the Court in *Victory Carriers Inc. v. Law,* 404 U.S. 202, 212, 92 S.Ct. 418, 425, 30 L.Ed.2d 383 (1971), that courts of admiralty not intrude without specific Congressional authorization into an area in which the state has an interest

**1190**

and that otherwise would be governed by state law." *Id.* at 13.

What of exposure during repair work performed on ships in navigable waters? The *Austin* court's reasoning and analysis in this respect are most persuasive. In many ways, it makes little sense to regard such work as maritime where it involves extensive, sophisticated repair to ships that have been totally taken out of navigation and are incapable of functioning as ships, and where the asbestosis risk is no different than on land.[18] On the other hand, ship repair contracts have been traditionally regarded as maritime. And the unavailability of a seaworthiness remedy has not been equated with nonmaritimeness. *See, e.g., Williams v. Avondale Shipyards, Inc.,* 452 F.2d 955 (5th Cir.1971) (injury on "test run" in open sea); *Watz, supra* (repairman's injury on ship lying in navigable water; pre-*Executive Jet*). We need not decide that question here, however. We agree with *Keene* that "[g]eneral allegations that the contracts with asbestos took place in shipyards or even aboard launched vessels are . . . insufficient to establish admiralty jurisdiction." 700 F.2d at 844. The present complaint does not allege, and the record does not suggest, that any of the plaintiffs suffered asbestos exposure performing ship repair work for Litton on launched vessels, or indeed ever performed ship repair work or work on navigable waters. We accordingly must reverse whether or not we fully adopt the *Austin* position. It may be that none of the plaintiffs will have suffered material exposure while performing ship repair work on navigable waters, or it may be that some will even meet the *Austin* test. Accordingly, we do not now decide whether to adopt all aspects of the *Austin* rationale. In any event, facts sufficient to invoke admiralty jurisdiction have not been alleged or shown here.

CONCLUSION

We hold that the district court's subject matter jurisdiction was not shown by the facts alleged in the complaint or otherwise apparent of record, on any of the bases on which jurisdiction was sought to be predicated, namely diversity, federal question jurisdiction and admiralty. We accordingly reverse the judgment of the district court. Because it is not necessarily inconceivable that one or more plaintiffs would be able to establish admiralty jurisdiction by amended complaint, if the district court in the first instance should see fit to allow such, we do not ourselves now direct dismissal, but rather remand to the district court for further proceedings consistent with this opinion.

REVERSED and REMANDED.

---

**18.** Also, like *Austin,* but unlike *Keene,* and perhaps *White II,* we do not give controlling significance to whether the products were specially designed for maritime purposes. *See Sperry Rand.*