COX CABLE NEW ORLEANS, INC.

v.

CITY OF NEW ORLEANS, et al.

CITY OF NEW ORLEANS, et al.

v.

COX CABLE NEW ORLEANS, INC.

Civ. A. Nos. 84–3743, 84–4264.

United States District Court,
E.D. Louisiana.

Oct. 4, 1984.

Defendants may respond by October 22, 1984, and plaintiffs may reply by October 29, 1984. It is so ordered.

Salvadore Anzelmo and Thomas W. Milliner, Ashton R. Hardy, Lynne W. Wasserman, Fawer, Brian, Hardy & Zatzkis, New Orleans, La., for the City.

Brent N. Rushforth, Dow, Lohnes & Albertson, Washington, D.C., Walter B. Stuart IV, Gerald F. Slattery, Jr., and William T. D'Zurilla, Gordon, Arata, McCollam Stuart & Duplantis, New Orleans, La., for Cox.

## OPINION

WICKER, District Judge.

These consolidated cases were submitted to the Court on a former date. Presently pending are three motions: (1) Cox Cable New Orleans, Inc.'s (Cox's) motion for summary judgment on its amended complaint for a declaratory judgment in Civil Action No. 84-3743, which concerns the issue of federal preemption of local regulation of the "retiering" of basic subscriber cable service (basic service); (2) the Mayor, City Council, and City of New Orleans's (collectively the City's) motion to dismiss this complaint for lack of federal subject matter jurisdiction; and (3) the City's motion to remand No. 84-4264 back to state court for lack of jurisdiction.

After considering the record, the exhibits, the arguments and voluminous briefs of counsel, the briefs of *amici curiae*, and the applicable law, the Court holds that there is a substantial federal issue raised by Cox's amended complaint in No. 84-3743 and that this Court, therefore, has jurisdiction.

The Court agrees with Cox that there is no material issue of fact presented in its declaratory judgment complaint and that the case is ripe for summary judgment. Given those undisputed facts, however, Cox's substantive position is not supported by the law. Accordingly, the Court denies Cox's motion for summary judgment and holds that federal preemption does not authorize Cox to remove stations and services from its Basic Service tier without City Council approval.

Since the declaratory judgment action resolves the sole federal issue presented, the Court need not determine whether it has jurisdiction over removed action No. 84-4264. Regardless of the technical nuances of federal question jurisdiction over this matter, it is more appropriate for state court adjudication. The Court accordingly will remand No. 84-4264 to state court. Since no federal issues remain in No. 84-3743, the Court similarly will dismiss all remaining claims in that suit without prejudice to renew these matters in state court.

## I.

Cox Cable is a cable television company which operates a local cable monopoly in Orleans Parish pursuant to a city franchise. The franchise agreement designates that Cox is to provide cable services to residents of New Orleans. Among these, Cox is to furnish a Basic Service package of 31 stations, including seven "must carry" stations which Federal Communication Commission (FCC or the Commission) rules require the cable operator to carry, for $7.95 per month (Franchise § 8.2; 10.2; Exhibit to Document No. 2).

These suits initially began when Cox filed a complaint and motion for a Temporary Restraining Order at roughly midnight on July 30, 1984 (Document No. 1).[1] Cox intended to raise the rates charged to customers for this 31-channel Basic Service effective August 1 by simultaneously (1) restructuring its Basic Service into two tiers, *i.e.*, one, "Introductory Cable," with eleven channels and the other, "New Orleans Plus," with twenty-two channels;[2] and (2) changing the rate from $7.95 for the original package to $4.95 for Introductory Cable plus $6.00 for Plus service, or a total of $10.95 for the new two-tiered scheme. Cox sought to restrain the Mayor and City Council from filing suit or passing any ordinance which would prevent it from implementing its retiering proposal or which would penalize it for doing so.

---

1. All references are to documents in Civil Action No. 84-3743 unless indicated otherwise.

2. The two-tier package included two new services for a total of 33 channels.

A conference was held in chambers on July 31 at which time the Court scheduled a hearing on the Temporary Restraining Order for August 2 in order to give the City Attorney's Office an opportunity to review the complaint and prepare a response. On August 1, 1984, Cox's rate increase went into effect.

The City then filed a cross-motion for a Temporary Restraining Order seeking to enjoin Cox from altering the rates charged for "must carry" signals (Document No. 6). After hearing counsel's arguments, the Court on August 2 denied Cox's motion and issued a Temporary Restraining Order in favor of the City requiring Cox to roll the rates back to the level charged prior to August 1 and setting a preliminary injunction hearing for August 14, 1984 (Document No. 9). The Court issued an opinion in this regard the following day (Document No. 11).

The parties filed supplemental briefs in support of their motions for preliminary injunctions. The Federal Communications Commission (FCC), the National Cable Association, Inc. (NCTA), and the Community Antennas Association, Inc. (CATA), which believed that this case would have nationwide impact, filed motions for leave to participate as *amici curiae*, which the Court granted.

On August 14, counsel jointly requested a continuance of the hearing in order to pursue an amicable settlement of the case. The Court issued an order rescheduling the hearing for August 22 with the Temporary Restraining Order to continue in effect (Document No. 26).

On August 22, Cox abandoned its motion for a Temporary Restraining Order. The City expressed that it did not seek to restrain Cox from retiering its Basic Service tier, so long as the basic rate remained the same. Rather, it felt a suit for breach of contract in state court would be the appropriate vehicle for addressing Cox's proposed actions if and when they occurred. The Court, therefore, explained on the record that, given the concessions of the parties and the posture of the suit, a tentative agreement had been reached in the case. The Court granted the City's preliminary injunction preventing Cox from altering its basic rate and dismissed Cox's abandoned motion for preliminary injunction (Document No. 57; 55:24–57:3).

Following this brief impasse, Cox immediately retiered its service. It informed subscribers that effective September 1, it would offer the 11-channel "Introductory Cable" package for $7.95 and the 22-channel "New Orleans Plus" service for $3.00 extra. In this way, it could achieve its rate hike while complying with the City's desire to maintain the same rate for the "basic" tier, whatever it might contain. Much to the public's surprise, the injunction which had appeared to be a victory for the City resulted in higher basic rates than Cox had requested.

Simultaneously, Cox filed a motion for leave to amend its complaint to add a declaratory judgment action. The amended complaint seeks a declaration that "in view of federal law, Cox may delete, without substitution, any or all 'non-must carry' signals from its basic tier without the approval of the City" (Document No. 29). Cox then filed a motion for expedited hearing on a motion for summary judgment on this claim which the Court denied (Document No. 31).

The City, seeking to have the entire case heard in state court, filed a suit for breach of contract there on August 28 (Number 84–4264, Document No. 1) and also filed an opposition to the motion to amend (Document No. 34). This opposition admitted that " 'an actual controversy' exists on the issue of [Cox's] ability to remove the number of services from the basic tier." It argued, however, that the case was more appropriate in state court where the later-filed suit was already "pending".[3] One hour later, Cox removed the state suit to

---

3. The Clerks' stamps in fact indicate that the City's state court petition was filed at 4:52 P.M. on August 28, fifteen minutes after the City's 4:37 filing of its opposition to Cox's motion to amend Number 84–3743.

federal court (Docket Number 84–4264, Document No. 1).

On August 29, the Court granted Cox's motion to amend (Document No. 37). Not giving up in its forum shopping battle, however, the City filed motions to dismiss or continue Cox's motion for summary judgment (Document No. 39), to dismiss Cox's amended complaint for lack of federal jurisdiction (Document No. 43), and to remand the removed action to state court (Docket Number 84–4264, Document No. 4–b). These three motions, along with Cox's motion for summary judgment, came before the Court on September 12. At that time, the City indicated that it had not been given enough time to brief the complex issues presented by the motion for summary judgment. The Court, therefore, granted the City's motion to continue and continued all other motions until September 26, affording the parties additional time in which to submit any final briefs (Document No. 50; No. 56, 25:1–28:22).

On that date, the Court heard arguments on the three motions which are now before it: Cox's motion for summary judgment on its complaint for declaratory judgment on its complaint for declaratory judgment in Number 84–3743; the City's motion to dismiss this complaint for lack of federal jurisdiction; and the City's motion to remand Number 84–4264. The Court will first address the jurisdictional issues.

## II.

■ The district courts have jurisdiction over all civil actions "arising under" the Constitution, laws or treaties of the United States. 28 U.S.C. § 1331. Federal law must be an essential element of the cause of action. *Gully v. First National Bank*, 299 U.S. 109, 112, 57 S.Ct. 96, 97–98, 81 L.Ed. 70 (1936); *Lowe v. Ingalls Shipbuilding*, 723 F.2d 1173, 1178 (5th Cir. 1984). Under the "well-pleaded complaint" rule, it is the nature of the claim asserted, and not the possible defenses to the claim, which determines if federal jurisdiction is present. *Id.*

■ The Declaratory Judgment Act, 28 U.S.C. § 2201, is procedural rather than substantive and does not, therefore, expand the reach of federal jurisdiction. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950). It procedurally broadens the class of litigants who may bring causes of action into federal court since "the availability of declaratory relief enables a party to achieve federal question jurisdiction over a suit to declare that a claim arising under federal law which another asserts against him is not valid." *Lowe v. Ingalls Shipbuilding, supra*, 723 F.2d at 1179. The Act does not, however, enable parties to acquire federal jurisdiction by bringing a declaratory judgment action when the sole federal question would have been by way of defense if the suit were brought in the usual state court proceeding.

■ In *Public Service Commission of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 248, 73 S.Ct. 236, 242–43, 97 S.Ct. 291 (1952), the Supreme Court stated that when the declaratory judgment complaint in essence asserts a defense to a threatened state court action, it is the character of the threatened action, and not of the defense, which determines if there is federal jurisdiction. *Id.* That is, "if, but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state created action, jurisdiction is lacking." *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, ——, 103 S.Ct. 2841, 2850, 77 L.Ed.2d 420 (1983), quoting 10A Wright, Miller & Kane, Federal Practice and Procedure § 2767, at 744–45 (2d ed. 1983). It is, therefore, generally the declaratory defendant's and not the declaratory plaintiff's cause of action which is actually litigated and to which the federal court looks in ascertaining if federal jurisdiction is present. The City argues that federal jurisdiction is lacking since Cox's preemption claim arises only by way of defense.

■ An exception to this general rule applies, and federal jurisdiction is present, however, when the plaintiff seeks declaratory and injunctive relief against threatened state or local governmental action

which would interfere with federal rights. *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978); *Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); *Braniff International, Inc. v. Florida Public Service Commission*, 576 F.2d 1100 (5th Cir.1978); *see also, Lowe v. Ingalls Shipbuilding*, 723 F.2d 1173, 1180–81, n. 7 (5th Cir.1984). Thus, for example, in *Ray v. Atlantic Richfield Co., supra,* the district court had considered Atlantic Richfield's claim for a declaratory judgment that Washington's Tanker Law had been preempted by the Ports and Waterways Safety Act. In *Jones v. Rath Packing Co., supra,* the Supreme Court affirmed the district court's declaratory ruling that a county official's regulation of food packaging had been preempted by federal law. And in *Capital Cities Cable, Inc. v. Crisp,* —— U.S. ——, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984), upon which counsel rely as well, the plaintiff brought an injunctive and declaratory suit claiming that threatened state action had been preempted by FCC regulation.

This exception has been recently reaffirmed by the Supreme Court. In *Franchise Tax Board, supra,* 463 U.S. 1, 103 S.Ct. at 2852, n. 20, the Court stated that "a person subject to a scheme of federal regulation may sue in federal court to enjoin application to him of conflicting state regulations, and a declaratory judgment action by the same person does not necessarily run afoul of the *Skelly Oil* doctrine." And in the companion case of *Shaw v. Delta Airlines, Inc.,* —— U.S. ——, 103 S.Ct. 2890, 2899, n. 14, 77 L.Ed.2d 490 (1983), the Court stated that federal jurisdiction exists when plaintiffs seek an injunction against enforcement of state laws which they claim are preempted:

> The Court's decision today in *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, [77] L.Ed.2d [420], does not call into question the lower courts' jurisdiction to decide these cases. *Franchise Tax Board* was an action seeking a declaration that state laws were *not* preempted by ERISA. Here, in contrast,

companies subject to ERISA regulation seek injunctions against enforcement of state laws they claim are preempted by ERISA, as well as declarations that those laws are preempted.

It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. *See Ex Parte Young,* 209 U.S. 123, 160–62, 28 S.Ct. 441, 454–55, 52 L.Ed. 714 (1908). A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is preempted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.

■ Jurisdiction exists regardless of whether the district court eventually determines that the governmental action is or is not preempted. There must be "an existing dispute between the parties as to present legal rights amounting to a justiciable controversy which [the parties] are entitled to have determined on the merits." *Florida Lime and Avocado Growers, Inc. v. Jacobsen,* 362 U.S. 73, 85–86, 80 S.Ct. 568, 576, 4 L.Ed.2d 568 (1960); *see also, Shaw v. Delta Airlines, Inc., supra,* 103 S.Ct. at 2906 (Disability Benefits Law not preempted); *Lake Carriers' Association v. MacMullan,* 406 U.S. 498, 508–09, n. 12, 92 S.Ct. 1749, 1756, 32 L.Ed.2d 257 (1972) (must be a present and concrete controversy). Nor would it be sensible for a district court to have to engage in a full analysis of the merits of a case prior to determining whether the jurisdiction were present to consider the matter it had already resolved.

Plaintiffs, thus, may bring such injunctive actions so long as there is an actual controversy and a colorable claim that the state action has been preempted. Contrarily, suits in which plaintiffs seek declaratory judgments that regulation is not preempted may be brought exclusively in state court.

■ The federal rights exception applies here. While the City claims that this suit

is essentially one for breach of contract, Cox originally sought injunctive relief in No. 84–3743 to bar the City from enforcing the franchise agreement and from filing suit in state court to enforce this agreement because such actions were preempted by federal law. The declaratory judgment claim likewise seeks to prevent the City from interfering with Cox's purported federal rights under the Supremacy Clause. These are precisely the types of issues which federal courts should determine, regardless of which party may have brought the claim as plaintiff. Federal law is "a pivotal issue in the case, one that is basic to the determination of the conflict between the parties." *North American Phillips Corp. v. Emery Air Freight Corp.*, 579 F.2d 229, 233 (2d Cir.1978). *Compare City of Poughkeepsie v. Poughkeepsie Cablevision*, 571 F.Supp. 1225 (S.D.N.Y.1983) (no federal jurisdiction over suit by city to declare that cable franchise was not preempted by federal law). The immediacy of the City's threatened action is evidenced by the numerous newspaper articles accompanying the pleadings in which various Councilmen state their intentions, by the City's admission in its opposition to Cox's motion to amend, by the City's fervor in opposing Cox's position, and by the City's subsequent state court suit to block Cox's action. Because Cox sought relief from concrete and immediate governmental action which arguably interfered with its federal rights in No. 84–3743, this Court has jurisdiction over that action.

### III.

Cox argues that this Court also has jurisdiction over the state court action which it has removed since it also "arises under" federal law. A case arises under federal law where the vindication of a right under state law necessarily turns on some construction of federal law. *Franchise Tax Board, supra*, 463 U.S. at ——, 103 S.Ct. at 2846. Under the *Skelly Oil* doctrine, no federal jurisdiction is present if, but for the availability of the declaratory judgment procedure, a federal claim would arise only by way of defense to a state-created action. *Franchise Tax Board* expand-

ed the *Skelly Oil* rule to apply to removal of declaratory judgment actions brought in state court. A state declaratory action may be removed only if a nondeclaratory suit, either civil or injunctive, based on the same facts, would have presented a federal question. Thus, a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's complaint and even if both parties admit that the defense is the only question truly at issue in the case. *Id.*, 463 U.S. at ——, 103 S.Ct. at 2847. In *Franchise Tax Board*, therefore, the Supreme Court held that the state declaratory judgment action was not removable where California law had established a set of conditions, without reference to federal law, under which a tax levy could be enforced and federal law became relevant only by way of a defense to the obligation created by state law. *Id.*, 463 U.S. at ——, 103 S.Ct. at 2848.

At the same time, a plaintiff may not defeat federal jurisdiction by using artful pleading to omit necessary federal questions from his complaint. *Eitmann v. New Orleans Public Service, Inc.*, 730 F.2d 359, 365 (5th Cir.1984). Rather, it is the rule of the Fifth Circuit that the removal court must inspect the complaint carefully to determine whether a federal claim necessarily is presented, even if the plaintiff has couched his pleadings exclusively in terms of state law. *In Re Carter*, 618 F.2d 1093, 1101 (5th Cir.1980), *cert. denied*, 450 U.S. 949, 101 S.Ct. 1410, 67 L.Ed.2d 378 (1981). "The reviewing court looks to the substance of the complaint, not the labels used in it." *Id.*

In this case, the City seeks declaratory and injunctive relief stating that "Section 8 of the Franchise [is] valid and enforceable, and that Cox's removal of services from Tier I of Basic Service and removal of converters from subscribers are violations of the Franchise; and further that ... Cox's announced and intended reduction of the programming services in Tier I of Basic Service from the currently provided thirty-

one (31) services to eleven (11) services without Council approval is in violation of Section 8.2 of the Franchise...."

■ While the general rule is that federal preemption will not give rise to removal jurisdiction, *Illinois v. Kerr-McGee Chemical Corp.*, 677 F.2d 571, 577–78 (7th Cir.1982), *cert. denied*, 459 U.S. 1049, 103 S.Ct. 469, 74 L.Ed.2d 618 (1982); *Guinasso v. Pacific First Federal Savings & Loan Association*, 656 F.2d 1364, 1366 (9th Cir. 1981), *cert. denied*, 455 U.S. 1020, 102 S.Ct. 1716, 72 L.Ed.2d 138 (1982), this is based on the previous principle that federal jurisdiction may not rest on federal issues raised strictly in defense. The issue of when federal preemption of state law does not arise by way of defense, but rather would give rise to removal jurisdiction, is unsettled. Justice White, in his dissent to the denial of certiorari in the *Kerr-McGee* case in 1982 stated, "the issue whether, or under what circumstances a defendant's federal preemption claim presents a federal question sufficient to support removal of a state plaintiff's complaint which on its face raises only state claims, is a substantial one going to the heart of the power of federal courts to determine claims raised in state court proceedings. The Court should grant this case to resolve the conflict." 459 U.S. at 1050–52, 103 S.Ct. at 470–71. And in *Franchise Tax Board, supra*, the Supreme Court noted that "a claim of federal preemption does not always arise as a defense...." 463 U.S. ——, 103 S.Ct. at 2848, n. 12.

Other courts have held that federal preemption will give rise to federal jurisdiction on removal under certain circumstances. *E.g., Gunter v. Ago International B.V.*, 533 F.Supp. 86 (N.D.Fla.1981) (Securities Exchange Act of 1934); *Palm Beach Co. v. Journeymen's & Production Allied Services of America*, 519 F.Supp. 705 (S.D.N.Y.1981) (National Labor Relations Act). *See also North American Phillips Corp.*, *supra* (original federal jurisdiction due to preemption by Federal Aviation Act of 1958).

The complaint here is drafted exclusively in terms of state law. Still, determination of the breach of contract turns on whether the contract has been preempted by federal law. In fact, the language of the contract itself incorporates the issue of preemption. Section 10.8 states that "only those rates and charges for those services for which rate regulation is not preempted by the FCC shall be subject to regulation" by the City.

■ This Court, however, need not resolve the difficult issue of whether preemption arises only by way of defense on removal here. Even assuming that this Court has jurisdiction, the sole federal question in No. 84–4264 is the same preemption issue which is raised in No. 84–3743. Since the Court has jurisdiction over the latter suit and resolves this issue in Part IV of this opinion, *infra*, only pendent claims would remain in No. 84–4264 if the Court were to exercise jurisdiction over it. Whether such claims should be remanded is a question of judicial discretion, not subject matter jurisdiction. *In Re Carter, supra*, 618 F.2d at 1101. Federal courts should not, however, "make needless decisions of state law ... both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

The breach of contract issues are more appropriately considered by the courts of Louisiana. Accordingly, this Court determines only the federal issue of preemption. Number 84–4264 is, therefore, remanded to state court. Similarly, the remaining pendent claims in No. 84–3743 are dismissed without prejudice to renew these issues in an appropriate state court proceeding.

## IV.

The substantive legal issue raised by these cases is one of first impression: may a cable company, in order to effect a rate increase, "retier" a basic subscriber service package, which contains both the FCC's required "must carry" stations and non-"must carry" stations, without local regula-

tory approval, when the contract between the parties provides that the company must deliver specified services[4] and that no increases shall occur without governmental approval?[5] Put another way, has local regulatory authority over basic cable service rates and tiering been preempted by the FCC? Cox argues that it is free to remove program offerings from its Basic Service tier without Council approval regardless of the terms of its contract since those contract provisions which require it to provide a specific number of services, or specific offerings, above and beyond the FCC's required "must carry" stations are void as preempted by federal law. The City contends, however, that the contract is valid and no preemption has occurred.

■■■■■ Under the Supremacy Clause, state regulation may be preempted in a variety of ways, only one of which is relevant here: by the regulatory agency's[6] clear expression of an intent to preempt state law.[7] In *Crisp*, the Supreme Court set forth the test of whether the FCC has preempted a certain area of local agency cable regulation. The FCC must have (1) resolved to preempt the specific area in question; the determination must (2) represent a "reasonable accommodation of conflicting policies;" and (3) the agency must have the authority to preempt. —— U.S. at ——, 104 S.Ct. at 2701. In this instance, the Court holds that the FCC did not intend to preempt the local regulation in question, and to the extent, if any, that the Commission or its staff may purport to have done so in the *Community II* decision,[8] such actions, as accomplished, would be beyond its regulatory authority and, therefore, null and void.[9]

In *U.S. v. Southwestern Cable Co.*, 392 U.S. 157, 177–178, 88 S.Ct. 1994, 2005, 20 L.Ed.2d 1001 (1968), the Supreme Court held that Congress granted the FCC authority to regulate cable television in the Federal Communications Act of 1934, 47 U.S.C. § 151, *et seq*. In order "to make available ... to all the people of the United States a rapid, efficient, Nationwide and

**4.** Franchise § 4.24; § 8.2. Section 8.2 states which specific stations Cox must provide in Basic Service. Included are all seven must carry stations, plus a variety of others, including WTBS, ESPN, and the USA Network. Specifically not included are pay television services such as Home Box Office, Showtime and The Movie Channel. § 8.3.

**5.** Franchise § 10.2; § 12.1; § 12.2; § 12.3. Section 10.2 provides that Basic Service shall cost $7.95. Section 12.1 grants the City Council the authority to regulate the franchise. Section 12.2 grants the Council the power to regulate rates. Section 12.3 sets limits on rate increases and requires a public hearing prior to the Council's approval of a rate increase.

**6.** Usually it is .Congress which preempts state law, but federal agency regulations may also do so. "Federal regulations have no less preemptive effect than federal statutes." *Capital Cities Cable, Inc. v. Crisp*, —— U.S. ——, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984).

**7.** The other means are: when Congress has legislated comprehensively to occupy the field; and when compliance with both state and local law is impossible or the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crisp, supra*, —— U.S. at ——, 104 S.Ct. at 2700. In this case, the FCC has expressly decided not to occupy the field, but to preempt explicitly

and narrowly only those areas which it has determined should be within the exclusively federal regulatory domain. *See e.g., Clarification of the Cable Television Rules and Notice of Proposed Rulemaking and Inquiry*, 46 F.C.C.2d 175, 199–200 (1974). Nor is compliance with both City Council and FCC regulation impossible here where the FCC has expressly left regulation of basic subscriber services to local agencies. *See e.g., Report and Order, Duplicative and Excessive Over-Regulation-CATV, Docket No. 20272*, 54 F.C.C.2d 855 (1975).

**8.** The FCC staff counsel seems to argue in its *amicus* brief that the FCC has preempted the area of retiering. This is not in keeping with either the FCC's rulemaking or with its opinions. Nor can the staff counsel, without signatures of the Commissioners, speak for the FCC, particularly when counsel purports to make a rulemaking, which even the FCC may not do unless appropriate procedures are followed. *See* 47 CFR § 1.399 *et seq*.

**9.** It is unquestioned that the FCC has general authority to regulate the cable industry. *U.S. v. Southwestern Cable Co.*, 392 U.S. 157, 172–78, 88 S.Ct. 1994, 2002–05, 20 L.Ed.2d 1001 (1968). The crucial questions are whether the FCC has exercised that authority and, if so, whether it acted in compliance with its statutory obligations.

worldwide wire and radio communication service," the Commission may issue "such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law," as "public convenience, interest or necessity requires." 47 U.S.C. § 151, § 303(r).

Pursuant to this authority, for over 12 years, the FCC has consistently left to local governmental bodies the exclusive authority to regulate the rates of basic cable service, while rejecting cable companies' arguments that such regulation is overly-burdensome, unnecessary, or not in the public interest. In 1972, the Commission considered "how best to obtain, consistent with the public interest standard of the Communications Act, the full benefits of developing [cable] communications technology for the public...." *Cable Television Report and Order*, 36 F.C.C.2d 143, 144 (1972). Among the issues considered was the interrelationship of local and federal regulatory bodies. 36 F.C.C.2d at 204–10. *Amicus* in this case, NCTA, argued at that time that no local rate regulation was necessary and urged the FCC to preempt the field.[10] 36 F.C.C.2d at 205–206.

The FCC rejected the cable industry's views and opted in favor of "creative federalism" wherein local governments would regulate matters with which they had special expertise, such as franchise selection, rates and rate changes, and the handling of service complaints, while the FCC would set minimum standards which would be enforced through the process of issuing Certificates of Compliance. 36 F.C.C.2d at 207. Under this "structured dualism" of combined federal-local regulation, local regulatory bodies were given the authority to regulate the rates for the installation of equipment and for all "regular subscriber services," which were defined as "services regularly furnished to all subscribers." The federal regulations, 47 CFR § 76.-31(a)(4), specifically prohibited cable operators from changing the rates charged subscribers "except as authorized by the fran-

chising authority after an appropriate public proceeding affording due process...." 36 F.C.C.2d at 209, 219. The Commission enunciated a policy goal of insuring rates which were fair to both the cable system and the subscribing public. 36 F.C.C.2d at 209.

Completely separate from the FCC's discussion of federal-local relationships, which include rate regulation, was an analysis of so-called "signal carriage" regulation. 36 F.C.C.2d at 147–189. This analysis and the accompanying rules, 47 CFR § 76.51–76.67, concern which television "signals" a particular cable operator in a given geographic market may carry. The rules divided all signals into three categories: signals that a cable system must carry upon request of the broadcast station, signals that a cable system may carry given the size of the particular geographic television market, and signals that same system may carry in addition to those required or permitted in the other two categories. 36 F.C.C.2d at 170–71, 220–33. "Signal carriage" had no bearing on subscriber rates, local regulation of cable operations, packaging of cable program offerings to subscribers, or retiering or recombining of such subscriber packages. Rather, it concerned such issues as "major television markets," § 76.51; boundaries of television markets in terms of laditudinal and longitudinal "reference points," § 76.53; and the "manner of carriage" in terms of quality of broadcast signals, the channel number on which a signal shall be carried, and the abridgement of the content of broadcast programs, § 76.55. The purpose of this preemption was to keep local agencies from requiring operators to receive signals which were not allowed by the FCC. The Commission specifically stated that these carriage provisions did not affect federal-local relationships, such as designation of the proper governmental authority to regulate rates. 36 F.C.C.2d at 165, 207.

---

**10.** In 1969, the Commission had indicated that local regulation of cable television inconsistent with its regulations is preempted. *First Report and Order*, 20 F.C.C.2d 201, 223 (1969). This authority has been acknowledged by the Supreme Court. *Crisp, supra,* —— U.S. at ——, 104 S.Ct. at 2700–01.

Later in 1972, the Commission reconsidered its order. At that time, it altered the word "changes" in rates in § 76.31(a)(4) to "increases" in rates. Local governments therein retained the right to regulate rate increases for all regular subscriber services. *Reconsideration of Cable TV Report and Order,* 36 F.C.C.2d 326, 327, 374 (1972).

In 1974, the Commission sought to clarify its cable rules. It stated that it had preempted all regulation of signal carriage and reiterated that signal carriage concerned which transmission signals a cable operator may carry, not regulation of cable service rates or the sales packaging of services the cable carried. *Clarification of the Cable Television Rules and Notice of Proposed Rulemaking and Inquiry (Clarification),* 46 F.C.C.2d 175, 178, 188–92, 199–200 (1974). The Commission confirmed that regulation of the rates of services supplied to all subscribers remained with local government. It drew a distinction between that regular service which must include at minimum "all broadcast signal carriage and all our required access channels including origination programming," [11] which was to be regulated at the local level, and "specialized programming" or "pay-television" for which a per-program or per-channel charge is made, which local agencies could not regulate. The FCC preempted regulation of such special pay services, along with "other" non-regular subscriber services such as cable advertising, alarm systems, and two-way systems and decided that there should be no regulation of the rates on either local or federal levels of such new and innovative operations.[12] 46 F.C.C.2d at 199–200.

In 1975, the Commission considered whether there was a need for additional rules to remedy duplicative or excessive over-regulation of cable television since both state and municipal governments had been regulating the industry. The Commission rejected arguments that local regulation, even if it leads to "three-tier" regulation, is necessarily burdensome. *Report and Order, Duplicative and Excessive Over-Regulation—CATV, Docket No. 20272,* 54 F.C.C.2d 855, 858, 863 (1975). The FCC stated that it intentionally had left a considerable amount of regulatory responsibility at the local level and had preempted only specific, narrow aspects of cable regulation. While signal carriage and pay cable, among other subjects, had been preempted, other elements had not been. The Commission concluded that this was "the correct course to follow. While it leads to many difficulties and complications that could be avoided by total preemption, we think that the benefits derived, especially from local determination of the franchisee, to date, here outweighed the liabilities of such an approach." 54 F.C.C. at 863.

In 1976, the Commission continued to hone its rules on local regulation of regular subscriber rates by soliciting views on whether § 76.31(a)(4), which made local rate oversight mandatory, should be modified or deleted. *Notice of Proposed Rulemaking, Subscriber Rates-CATV, Docket No. 20681,* 57 F.C.C.2d 368, 368–69 (1976). Following the notice, that section was deleted by the Commission. *Report and Order, Subscriber Rates-CATV, Docket No. 20681,* 60 F.C.C.2d 672 (1976). This action was taken since some local agencies did not have the authority to comply with the Commission's rules and since rate control was not necessary in some geographic areas where regulation would lead to higher, rather than lower rates. 60 F.C.C.2d at 682–83.

---

11. The FCC's access channel requirement was struck down by the Supreme Court in 1979. *FCC v. Midwest Video Corp.,* 440 U.S. 689, 708–09, 99 S.Ct. 1435, 1445–46, 59 L.Ed.2d 692 (1979).

12. The FCC did not cast pay television irretrievably into the hands of cable operators, however. It indicated that it would step in and regulate these new services if the free market did not prove adequate to protect the public interest. 46 F.C.C.2d at 200. FCC preemption of rate regulation of pay television was affirmed the following year, *First Report and Order, Subscription TV Program Rules, Docket No. 19554,* 52 F.C.C.2d 1, 67–68 (1975), and has been upheld by the Second Circuit, *Brookhaven Cable TV, Inc. v. Kelly,* 573 F.2d 765 (2d Cir.1978).

Cox's parent corporation, Cox Cable Communications, and *amici* NCTA and CATA once again argued that local regulation of basic rates was unnecessary and burdensome and should be preempted as pay-cable rates had been. 60 F.C.C.2d at 676, 677, 681, 684–85. The FCC refused to preempt local regulation, but reaffirmed its 1972 policy of allowing local agencies to regulate regular subscriber rates since these rates "could best be reviewed by the local franchising authority." 60 F.C.C.2d at 673. While determining in this *Report and Order* that it was counterproductive to the public interest to mandate local regulation where such regulation was impossible or superfluous, the FCC held that it should be up to local governments to decide if they would regulate and what methods they would employ to do so. The Commission confirmed that local regulation of regular subscriber rates had been successful in most instances and concluded that its holding assured that "most, if not all, subscriber rate problems may be effectively settled through local processes." [13] 60 F.C.C.2d at 685.

These rulings represent a clear delegation of authority to regulate regular subscriber services to local government. These services have continually included all services regularly furnished to all subscribers. *Cable Television Report and Order, supra,* 36 F.C.C.2d at 209. Prior to the deletion of the access channel rules, this service included at minimum, but was not limited to, "all broadcast signal carriage and all our required access channels including origination programming," but did not include pay television. *Report and Order, Docket No. 20681, supra,* 60 F.C.C.2d at 673, n. 1; *Clarification, supra,* 46 F.C. C.2d at 199–200. Subsequent to the deletion of these requirements, regular service still includes all service regularly provided to all subscribers, including the entire basic service package.

Cox's confusion stems from its reading that regular subscriber service includes only "must carry" stations. This is too narrow a reading of the FCC's rulings. Rather, the FCC requires these signals to be provided to all subscribers. It has not stated that they exhaust "regular subscriber service," but that they are elements to be included in such service. Cox's Basic Service, since it was received by all Cox customers, was in its entirety an element of regular subscriber service.

In spite of the clear expression of FCC policy encouraging local regulation of regular subscriber rates enunciated in these rulemakings, Cox argues that a recent FCC opinion, and its reconsideration [14] stand for the proposition that the City may not prevent Cox from retiering its Basic Service. In *In Re Community Cable, Inc.,* 54 R.R.2d 1351 (1983) (*Community Cable I*), the FCC considered whether cable operators could increase the rates charged for receiving a non-basic tier service, that is, something other than regular subscriber service. As the parties and the FCC phrased the issue, does preemption extend not only to pay cable television service for which a per-channel or per-program charge is made, "but also to specialized or auxiliary cable services ... provided in tiers of services offered to subscribers at a single package rate distinct from the rate charged for regular subscriber service?"

The opinion was clear to indicate that it concerned regulation only of Community Cable's "expanded tier," which was distinct from its "basic tier" or regular subscriber service, which in turn included not only "must carry" signals, but other non-mandatory programming. 54 R.R.2d at 1352 and

---

13. To aid local agencies in regulating regular subscriber rates, the Commission in 1976 sought to create a data bank on local rate regulation. In that notice, the Commission again emphasized that it had no intention of altering the role of local agencies in regulating rates. *Notice of Inquiry, Cable Television Subscriber Rates, Docket No. 20767,* 58 F.C.C.2d 915, 916 (1976). However, Commissioner Robinson was particularly

wary that cable television companies would use the notice as another opportunity to try to convince the Commission to preempt local rate regulation. 58 F.C.C.2d at 918 (Separate Statement of Commissioner Robinson).

14. The FCC apparently has not deemed either of these opinions significant enough to be published in its official reports to date.

n. 3. The FCC stated that it had already preempted rate regulation of pay television and other programming not offered as part of the subscriber's basic service package, 54 R.R.2d at 1358, and held that its "preemptive jurisdiction extends to non-basic services whether they are priced individually by channel or by program or as a group in one or more tiers of service," 54 R.R.2d at 1359. Since the "expanded tier" was within the ambit of "services not regularly provided to all subscribers," 54 R.R.2d at 1360, local government was prevented from regulating the rates of this tier.

The Supreme Court cited *Community Cable I* with approval in *Crisp*, stating that the Commission has deliberately preempted state regulation of non-basic program offerings. —— U.S. at ——, 104 S.Ct. at 2703, n. 9. *Community Cable I* broke no new ground and has no bearing on this case. It concerns rate regulation of a non-basic tier only, where local regulation has been preempted since 1972.

The FCC reconsidered this case and issued a subsequent opinion in July. *In Re Community Cable TV Inc.*, 56 R.R.2d 735 (1984) (*Community Cable II*). The FCC reiterated that the petition for reconsideration concerned only the preemption of regulation of non-basic service, which was defined as "services, whether offered singly or in tiers, not provided to all subscribers, for which additional fees are charged," and confirmed that basic service which is subject to local regulation extends to "that service regularly provided to all subscribers." 56 R.R.2d at 736, n. 2.

The Commission emphasized that *Community Cable I* had not changed any prior Commission rules, but had only reasserted that the FCC had preempted regulation of special non-basic pay cable services. 56 R.R.2d at 739. The Commission also recognized that had *Community Cable I* changed prior Commission policy, a rulemaking would have been required under federal law. *Id.*

There is nothing in *Community Cable II* which would indicate that "basic service" or "regular subscriber service" should be read in a new fashion so as to consist exclusively of "must carry" signals, as Cox contends. Rather, such services consist of "broadcast signals required to be carried by our rules as well as all required access services associated therewith and installation and reconnection charges, etc." 56 R.R.2d at 740. The word "etc." indicates that local agencies retain the right to regulate the entire basic tier which may contain non-"must carry" signals, just as the Commission had approved in *Community Cable I*. This reading is supported by *Community Cable II*'s definition of the opposite phrase "non-basic services" as services "not regularly provided to all subscribers," "those services above and beyond the basic service tier, which every subscriber to a system receives." 56 R.R.2d at 739, n. 6.

*Community Cable II* considered a second issue, not considered in *Community Cable I*, which arose from a New Jersey company's petition for a declaratory ruling: whether a cable operator could retier a non-basic service tier without local government approval.[15] Both parties cited Footnote 6 of this opinion in support of their positions and seem to feel it is determinative of this case.[16] Cox contends that it

---

**15.** The *Community Cable II* case was decided after the Supreme Court's ruling in *Crisp*. The issue of local regulation of retiering arose for the first time in *Community Cable II*. Thus, *Crisp*, which cited *Community Cable I* with approval, does not support the second opinion.

**16.** Footnote 6 states:
> As we stated in *Community Cable TV, Inc.*, 54 R.R.2d at 1360, nonbasic services are those "not regularly provided to all subscribers...." That is, those services above and beyond the basic service tier, which every subscriber to a system receives. There is no magic number

of channels which constitutes basic service, save for the minimal requirement of all mandatory signals. Given our preemption of local signal carriage regulation, the choice at any time of what will constitute basic service above and beyond signals whose carriage is mandated by our rules, remains within the discretion of the system operator. Of course, if an operator chooses to provide discretionary services as part of basic service, whether this be 12–, 20–, 36–, or 54-channel service, or more, the rate for the entire basic tier remains subject to local regulation.

allows operators to remove any offerings from its basic tier so long as "must carry" stations are retained. The City argues that it states that the entire basic tier, regardless of its makeup, is subject to regulation.

*Community Cable II* must be read in precedential context. It also concerned retiering of a non-basic tier only and its holding must be read in light of this limitation. As the Commission stated, "it has been clear for some time that local and state authorities are preempted from regulatory 'rates, terms and conditions' of pay and other video auxiliary services.... Whatever other legitimate actions the [local] Board may take, it may not interfere with Cablevision's clear right to tier its [non-basic] services as it wishes." 56 R.R.2d at 741–42. In fact, the first sentence of Footnote 6 itself limits its reach to non-basic tiers.

Cox seeks to have this Court infer that *Community Cable II* holds that local governments cannot prevent retiering of basic service as well. Even were this the intended meaning, such a proposition would have been strictly dicta to the *Community Cable II* case. This court, however, is of the opinion that such a reading would be a misconstrual of the FCC's intent. The FCC was careful to indicate repeatedly that the opinion only applied to the regulation of a non-basic tier. While it recognized that a cable operator may "tier" its service as it wished, it referred to tiering of non-basic services only. In fact, in *Community Cable II*, the FCC specifically stated with approval that the New Jersey operator had previously applied for and received local authorization to retier basic service. 56 R.R.2d at 738.

Such a reading is consistent with FCC precedent which has always distinguished between regulation of various levels of service, not between types of regulation within a given level. That is, the FCC's holding that a local agency could not regulate retiering of a non-basic level was premised upon the fact that the regulation would have impacted a non-basic tier; it was not grounded on a distinction between rates and tiering. The case emphasized this by

declaring that "local and state authorities are preempted from regulating 'rates, terms and conditions' of pay and other video auxiliary services." 56 R.R.2d at 741–42. The fact that rates are grouped with terms and conditions of service indicates that the holding was based on the level of service, not on the fact that tiering per se was involved. Because *Community Cable II* did not change prior FCC precedent, local government franchisors are not preempted from regulating retiering of a basic subscriber service tier, but may hold a cable operator to its contractual duty to provide all promised stations on this tier.

Additional support for this proposition comes from the FCC's consistent express reservation to local government of regulatory power over "rates." The rate charged to subscribers is not a price in a vacuum, but is an amount charged for a unit of a given quantity and quality. A. Kahn, *The Economics of Regulation*, Vol. I, p. 21. Rates may be increased either by an increase in the price for a given commodity or by a decrease in the quantity or quality of units provided at a given price. By reducing the number of channels which are provided to basic subscribers from 31 to 11 at the same price, $7.95, Cox has increased the rate of basic service. The City has exclusive authority to regulate that rate and may block Cox's retiering scheme in order to enforce its authority.

City Council regulatory power over retiering derives also from its express FCC-granted authority to choose the franchisee. *See Crisp, supra,* —— U.S. at ——, 104 S.Ct. at 2702, n. 8. This authority carries with it the capacity to make reasoned, sensible selections to serve the public interest. That determination is largely based on what services will be provided by the potential franchisee and what rates it will charge.[17] If FCC rulings were interpreted to allow local governments the ability to choose franchisees, but not to allow them to contract with them for specific services and rates, agencies' ability to adequately

---

17. *See* affidavit of Councilman Singleton, Document No. 49.

screen applicants would be severely curtailed.

If *Community Cable II*'s Footnote 6 could be interpreted to imply that cable operators generally could remove services from a basic tier, it would still not forbid cable companies from contracting away this right. Assuming that local agencies' powers were as limited as Cox contends, agencies are not forbidden from contracting with operators to require certain services on a basic tier. Signal carriage rules prevent agencies from requiring operators to receive certain signals which they may not under FCC rules be able to obtain. They do not prevent agencies from requiring operators to place on a basic tier non-pay cable services, which, with FCC approval, they already provide to subscribers. This scenario is explicitly envisioned by *Community Cable II* which stated, "Of course, if an operator chooses to provide discretionary services as part of basic service, whether this be 12-, 20-, 36- or 54-channel service, or more, the rate for the entire basic tier remains subject to local regulation." 56 R.R.2d at 859, n. 6.

Additionally, if the *Community Cable II* case were to have held that basic service retiering were preempted, such a holding would represent a change in policy and would be beyond the Commission's authority. Under the Administrative Procedure Act, the Commission cannot change pre-existing rules without a rulemaking proceeding with the requisite notice, hearings, and agency procedures. 5 U.S.C. § 551(4), § 553. 47 CFR § 1.399 *et seq.* delineates the appropriate steps which the FCC must take to embark on such a proceeding, which were not followed in *Community Cable II.*

Cox finally contends that the Supreme Court's opinion in *Crisp* alone permits Cox to retier without Council approval. At issue in *Crisp* was FCC preemption of an Oklahoma state ban on alcohol advertisements transmitted on cable from out of state. *Crisp*, unlike this action, was a true signal carriage case since the state agency sought to regulate the content of the transmitted material, that is, the actual signal sent from broadcaster to cable operator.

The Oklahoma ban conflicted both with an explicit signal carriage regulation, 47 C.F.R. § 76.55(b), which prohibited local regulators from deleting or altering any portion of signals, and with the completely preempted area of pay cable. —— U.S. at ——, 104 S.Ct. at 2704.

In this case, Cox seeks to ride the coattails of *Crisp* by framing the issue as one of signal carriage. However, Cox has never attempted to define or to delimit signal carriage and no signal carriage issues or regulations are involved here. The City does not seek to alter the substance of broadcast signals. It does not desire to tell Cox on what channel it is to transmit its services. Nor does it want to require Cox to carry signals which are not permitted by the FCC's rules. The City merely seeks to regulate the rate of Cox's service by holding the company to its contractual agreement to provide certain services on the Basic Service tier. This has continually been within the proper purview of local regulation and has always been an element of the FCC's discussions of federal/local relationships, not part of its analysis of preemptive signal carriage regulations.

Nor does this case concern pay cable. The services which Cox removed were by contract provided to all customers for the Basic Service price. No additional charge was made either on a per-channel or supplemental tier charge basis. The fact that Cox may want to make these into pay services does not make them so at the relevant time of contracting. *Crisp*, therefore, has no bearing on this matter.

■ The City's regulation of Cox's Basic Service retiering is premised on three grounds which have been expressly recognized by the FCC: the right of local agencies to regulate retiering as an element of rate regulation; their authority to choose the cable franchisee; and their general grant of responsibility over basic subscriber services. To date such regulation has not been preempted by federal regulations, the FCC or the Supreme Court. The City Council may properly regulate Cox's Basic Service and prevent the company from ei-

ther changing its rate or removing program offerings from this service. The City may also hold Cox to its contractual obligations and, under the express terms of the contract, injunctive remedies are available.[18]

## V.

In summary the Court holds:

██ 1. Local governing bodies or regulatory agencies are not preempted from regulating the number or nature of program offerings, whether they are broadcast stations, satellite services, or alphanumeric programming services, which are provided to cable television subscribers on a basic subscriber service tier;

██ 2. Such governing bodies are not preempted from entering into contracts with cable operators, which contracts require the operators to provide specific offerings on the basic subscriber service tier; nor are such contracts or their applicable provisions void as violative of federal law;

██ 3. Cox Cable New Orleans, Inc. (Cox) voluntarily contracted with the City of New Orleans to provide 31 such offerings including Entertainment and Sports Programming Network (ESPN), USA Network, Atlanta Station WTBS, and others on its Basic Service tier, 20 of which services were later removed unilaterally by Cox; and

4. Federal preemption does not authorize Cox to remove stations and services from its basic tier without the City Council's approval; that is, federal preemption of local regulation is not a viable defense to a suit by the City of New Orleans for breach of contract in response to Cox's "retiering" of its Basic Service.

ACCORDINGLY, THE COURT HEREBY DENIES Cox's motion for summary judgment.

THE COURT HEREBY REMANDS Civil Action No. 84-4264 to state court. All remaining state claims in No. 84-3743 ARE HEREBY DISMISSED by the Court without prejudice to renew these matters in state court.

18. Franchise § 12.4(f).

Let judgment be entered in favor of defendants, City of New Orleans, Louisiana; The City Council of New Orleans; Honorable Ernest N. Morial, in his capacity as Mayor of the City of New Orleans; and the Honorables Sidney J. Barthelemy, Joseph I. Giarrusso, Bryan Wagner, James Singleton, Michael Early, Lambert C. Boissiere, Jr. and Wayne M. Babovich, in their official capacities as Councilmen for the City of New Orleans, and against Cox Cable New Orleans, Inc., dismissing plaintiff's suit at its costs.